Michael P. LEWIS, Plaintiff,

v.

Eric D. ROSENFELD, Robert Bernstein, Robert B. Tannenhauser, and Rosenfeld, Bernstein & Tannenhauser, L.L.P., Defendants.

No. 00 CIV. 5368(SAS).

United States District Court, S.D. New York.

March 8, 2001.

Michael Schneider, New York City, Robert K. Whitt, Midland, TX, for Plaintiff.

Leonard Benowich, Roosevelt, Arfa & Benowich, LLP, White Plains, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Michael P. Lewis brings this action against Eric D. Rosenfeld, Robert Bernstein, Robert B. Tannenhauser (collectively "Individual Defendants") and Rosenfeld, Bernstein & Tannenhauser, L.L.P. ("RBT"), the law firm in which the Individual Defendants were general partners. Lewis asserts state law claims of breach of fiduciary duty, common law fraud, civil conspiracy, and negligent misrepresentation. Jurisdiction is based on diversity of

citizenship pursuant to 28 U.S.C. § 1332.[1] Defendants now move to dismiss the Amended Complaint on the grounds that it is time-barred and that it fails to state a claim on which relief can be granted. For the foregoing reasons, defendants' motion is granted in part and denied in part.

## I. LEGAL STANDARD

To properly rule on a 12(b)(6) motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *See ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 220–21 (2d Cir. 2001). "At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'" *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir.2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998)). The task of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims*, 230 F.3d at 20 (quotation marks and citation omitted). Therefore, dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *ICOM Holding*, 238 F.3d at 220 (quoting *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999)).[2]

## II. BACKGROUND

This action arises out of a $650,000 loan plaintiff made to Mad Martha's Ice Cream, Inc. ("Mad Martha's") in June 1995—a loan which was never repaid because Mad Martha's filed for bankruptcy on February 27, 1996. *See* Am. Compl. ¶¶ 52, 62. Plaintiff agreed to loan Mad Martha's these funds upon the advice of David M. Fresne, a Managing Director and broker at Bear, Stearns & Co., Inc. ("Bear Stearns"), who handled plaintiff's Bear Stearns accounts from April 1992 until April 1996. *See id.* ¶¶ 10, 46. Neither Fresne nor Bear Stearns are named as defendants in this action.

### A. Mad Martha's Fund Raising Needs

In 1993, Tom Quinn began negotiating with Robert Young for the purchase from VSL of the Mad Martha's Ice Cream Stores ("Ice Cream Stores") on Martha's Vineyard.[3] *See id.* ¶ 12. Quinn contacted Rosenfeld, seeking both legal assistance and help raising the funds to purchase Mad Martha's. *See id.* Mad Martha's Management Corp. ("MMMC") was formed for the purpose of soliciting the funds. *Id.* The Individual Defendants and Fresne also formed a general partnership, Tower Hill Associates ("Tower Hill"), for the purpose of conducting activities relating to the purchase of Mad Martha's. *See id.* ¶ 13.

Although MMMC failed to raise sufficient funds to make the full down payment, it purchased Mad Martha's in late August

**1.** Plaintiff is a resident of the State of Texas while defendants are residents of the State of New York. *See* First Amended Original Complaint ("Am.Compl.") ¶¶ 1–5.

**2.** In deciding a Rule 12(b)(6) motion, the court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999).

**3.** The Amended Complaint provides no further information about Quinn, Young, or VSL.

1993 by issuing a short-term note for the difference. *See id.* ¶ 15. This left MMMC with little working capital. *See id.* Nevertheless, in 1994, its first year of operation, MMMC expanded and opened ice cream stores on Nantucket Island and on Block Island. *See id.* ¶ 18. Quinn signed the lease for the Nantucket Store. *See id.* ¶ 21. However, due to the "negligence and incompetence" of Rosenfeld, Bernstein and RBT, the lease to the Nantucket Store was never transferred to MMMC.[4] *See id.* Because of this, Quinn was able to retain possession of and operate the Nantucket Store as if it were his own, despite being discharged from MMMC and accused of stealing $400,000 from MMMC. *See id.* ¶¶ 20, 22. As a result, by the end of the 1994 Season,[5] MMMC was absolutely broke. *See id.* ¶ 19. A new corporation, Mad Martha's Ice Cream, Inc. was formed and took over all the assets, activities and operations of MMMC. *See id.* ¶ 23. Mad Martha's stock was issued to Tower Hill, even though Tower Hill contributed no capital to Mad Martha's. *See id.*

In November 1994, Young caused VSL to repossess the Ice Cream Stores as the first step in foreclosure proceedings. *See id.* ¶¶ 25. By agreement dated March 9, 1995, Mad Martha's agreed, *inter alia,* to pay VSL substantial funds by June 30, 1995, also known as the "Drop Dead Date." *See id.* ¶ 27. If not paid by then, VSL would be permitted to foreclose without Mad Martha's objection. *See id.*

In early 1995, Fresne, at Rosenfeld's urging, contacted Lewis almost daily for the purpose of soliciting Lewis as an investor in Mad Martha's. *See id.* ¶ 39. Ro-

senfeld knew that Lewis was Fresne's customer at Bear Stearns and that Fresne owed Lewis fiduciary duties. *See id.* Lewis received a private offering memorandum for a Mad Martha's equity offering. *See id.* ¶ 40. After reading certain portions of the offering memorandum, Lewis returned it and informed Fresne that he was not interested in investing. *See id.* ¶ 41. Undaunted, Fresne, again at Rosenfeld's urging, continued to press Lewis. *See id.* ¶ 42. Plaintiff alleges that Fresne—who was now acting for Tower Hill, not Bear Stearns—was "acting as a conduit between Rosenfeld and Lewis and was 'parroting' Rosenfeld; i.e., Rosenfeld was telling Fresne what to say to Lewis to induce Lewis to invest the $650,000 into Mad Martha's." *See id.*

### B. Material Misrepresentations and Omissions

Plaintiff alleges that Fresne and Rosenfeld made numerous oral misrepresentations of material fact during a June 1995 telephone conversation between Fresne, Rosenfeld and Lewis. *See id.* ¶ 43. After quoting at length from a tape recording of the conversation, plaintiff summarizes these misrepresentations as follows:

a. That Mad Martha's was the owner (free and clear of all claims and encumbrances) of the Nantucket and other Ice Cream Stores, when in fact, it had no interest in the Nantucket Ice Cream Store;

b. That Mad Martha's owed only $390,000 to the party from whom it

---

**4.** In March 1995, Mad Martha's sued Quinn, seeking to force him to assign it the lease to the Nantucket ice cream store. *See* Am. Compl. ¶ 31. The court refused to order Quinn to assign the lease to Mad Martha's or to make Quinn cease operating the Nantucket Store. *See id.* ¶ 32.

**5.** The Ice Cream Stores were opened only during the "Season," which runs from approximately April through October. *See* Am. Compl. ¶ 16.

purchased the Ice Cream Stores on Martha's Vineyard;

c. That Mike Lewis was receiving a first lien on the Nantucket Store and all furniture and fixtures therein (when Mad Martha's was not the owner, operator or in possession of such store);

d. That Mad Martha's stock was worth $1.20/share and had been valued ... at $1.20/share (when the stock was worthless as shown by the sworn schedules filed in the bankruptcy [proceeding] listing $2,083,850.26 in debts and only $56,303 in assets);

e. That the Nantucket Store is the biggest one (when Mad Martha's was not the owner, operator or in possession of such store);

f. That the Nantucket Store does "$4 grand a week" (when Mad Martha's was not in possession of or operating any of the Ice Cream Stores and had just lost the injunction hearing to require Quinn to return the Nantucket Store to Mad Martha's);

g. That Lewis was receiving a second lien on the Ice Cream Stores on Mad Martha's Island [sic] and that only $400,000 (or $390,000) was owed to the guy with the first lien (when, after receiving over $350,000 out of Lewis' $650,000, over $350,000 was still owed to the holder of the first lien);

h. That Mad Martha's was generating revenues and would "generate a few hundred thousand this summer" (when Mad Martha's was not even in possession of or operating the Ice Cream Stores and was generating no revenues at all);

i. That Lewis' loan of $650,000 was a "no brainer" (when no reasonable person with full knowledge of the facts would have made such investment);

j. That Rosenfeld's role in the transaction was that of the "attorney/of counsel guy" (when Rosenfeld was a partner in Tower Hill Associates and was going to receive a part of the 13% commission ($84,500) that was never disclosed to Lewis).

*Id.* ¶ 44.

Plaintiff also alleges several examples of written misrepresentations and omissions. For instance, Farkas, with Rosenfeld's assistance, wrote Lewis a letter dated June 14, 1995, which allegedly contained numerous misrepresentations of material facts and omissions. *See id.* at ¶ 47. Rosenfeld also wrote Lewis a letter dated June 20, 1995, which allegedly contained numerous misrepresentations of material facts and omissions.[6] *See id.* Additionally, the security agreements and UCC forms prepared by Ellen Kaplan[7] (the "Kaplan documents"), which were sent to Lewis via Rosenfeld, contained numerous misrepresentations, many of which are similar to the oral misrepresentations outlined above. *See id.* ¶ 48. Finally, Rosenfeld sent Lewis a letter signed by Young (the "Young Letter") which misrepresented that "[w]e hereby assign to you a lien that we hold ... in the ice cream parlor located on North Water St., Nantucket, MA." *Id.* ¶ 50. Although signed by Young, the letter was solicited by Rosenfeld. *See id.*

Plaintiff alleges that Rosenfeld was aware of these misrepresentations and omissions, *see id.* ¶¶ 48, 50, and that plaintiff relied on them in making the decision

---

6. Plaintiff does not identify what the alleged misrepresentations and omissions were in either Farkas' or Rosenfeld's letters.

7. Kaplan was the attorney for Young and VSL. *See* Am. Compl. ¶ 24.

to loan Mad Martha's $650,000. *See id.* ¶ 52.

## C. Procedural History

Plaintiff first sued these defendants, among others, on May 13, 1996, seeking to recover the money he lent to Mad Martha's. *See id.* ¶ 7. Although that suit was filed in Texas state court, it was removed, based on diversity of citizenship, to the United States District Court, Southern District of Texas (the "Texas Lawsuit"). *See id.* Each of the defendants in this case was dismissed from the Texas Lawsuit for lack of personal jurisdiction. *See id.* Plaintiff appealed the dismissals, and on January 13, 2000, the Fifth Circuit Court of Appeals affirmed the trial court's decision. The Fifth Circuit's unpublished opinion stated that "[t]he several rulings by the district court on the personal jurisdiction issue are manifestly correct. The challenge thereto is frivolous." *Lewis v. Fresne,* No. 99–20389 (5th Cir. Jan.13, 2000).[8] However, on December 1, 2000, the Fifth Circuit recalled the mandate that was issued on January 13, 2000, stating that "[v]arious filings and the administrative handling thereof have resulted in errors and anomalies, including the inappropriate dismissal of the entire appeal." *Lewis v. Fresne,* No. 99–20389 (5th Cir. Dec.1, 2000).[9] The court reaffirmed dismissal of the appeal against Tannenhauser and Bernstein, but reinstated the appeals against, *inter alia,* Rosenfeld and RBT. *See id.* at 2.

## D. The Instant Lawsuit

Plaintiff filed this suit on July 20, 2000, asserting four state law claims. Claim I alleges that Rosenfeld and RBT knew of Fresne's fiduciary duties to Lewis and "knowingly participated in, aided and abetted, induced and/or substantially assisted Fresne in committing fraud and breaching [his] fiduciary duties." Am. Compl. ¶ 69. Plaintiff alleges that Rosenfeld acted for himself, RBT, and Tower Hill. *See id.* Claim II asserts that Rosenfeld—acting for both RBT and Tower Hill—and RBT committed common law fraud because they knew of Fresne's misrepresentations and omissions and "knowingly committed, participated in, aided and abetted, induced and/or substantially assisted" in Fresne's fraudulent actions. *Id.* ¶ 72. In the alternative, plaintiff asserts in claim III that defendants engaged in a civil conspiracy to divert plaintiff's funds to themselves or their affiliates. *See id.* ¶¶ 73–76. Claim IV alleges that the actions of Rosenfeld and RBT constitute negligent misrepresentation. Each claim seeks judgment against all defendants individually, jointly and severally. *See id.* ¶¶ 70, 72, 76, 78.

## III. DISCUSSION

Defendants move to dismiss the complaint on several grounds: (1) that the claims are time-barred; (2) that the Individual Defendants cannot be held vicariously liable; (3) that the claim for fraud fails to satisfy Rule 9(b) and fails to satisfy the elements of fraud; (4) that New York law does not recognize a claim for civil

---

**8.** A copy of this opinion is attached as Ex. 1 to Defendants' Memorandum of Law in Support of Motion to Dismiss the Amended Complaint ("Def.Mem."). The Court can take judicial notice of this opinion without converting this motion to dismiss into a summary judgment motion. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

**9.** A copy of this opinion is attached as Ex. A to the 12/22/00 Letter of Michael Schneider, counsel for plaintiff. The Court takes judicial notice of this opinion. *See supra* note 8.

conspiracy; and (5) that plaintiff has not adequately alleged a claim of negligent misrepresentation.

## A. Statute of Limitations

In a diversity case, a federal court must look to the law of the forum state to determine which statute of limitations applies. *See Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir.1998). New York law includes a "borrowing" statute, which states:

· An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. C.P.L.R. § 202 (McKinney 1990). Because plaintiff is not a New York resident, if plaintiff's claims accrued "without the state," the borrowing statute would apply and his claims would be untimely if barred under the law of either New York or the state where the action accrued.

 "When an injury is purely economic, the place of injury is usually where the plaintiff resides and sustains the economic impact of the loss." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999); *see also Gorlin v. Bond Richman & Co.*,

706 F.Supp. 236, 240 (S.D.N.Y.1989) ("For purposes of the New York borrowing statute, a cause of action accrues where the injury is sustained. In cases involving economic harm, that place is normally the state of plaintiff's residence.") (citation omitted). Plaintiff was a resident of Texas when his claims arose. Accordingly, the claims accrued in Texas and New York's borrowing statute does apply.[10]

Because the statute of limitations is an affirmative defense, defendants bear the burden of establishing that the limitations period has expired. *See Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir.1995). Defendants have met this burden.

Texas does not provide a specific statute of limitations for any of plaintiff's claims. However, the Texas courts have held that each of plaintiff's claims is governed by a two-year statute of limitations, except for plaintiff's fraud claim, which is subject to a four-year statute of limitations. *See Kansa Reinsurance Co. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1374 (5th Cir.1994) (breach of fiduciary duty); *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex.1990) (fraud); *Lofton v. Yount*, No. 01–96–00133–CV, 1998 WL 720648, at *4 (Tex.App. Sept.17, 1998) (civil conspiracy); *LaChance v. McCoy*, No. 03–96–00088–CV, 1997 WL 461985, at *4 (Tex.App. Aug.14, 1997) (negligent misrepresentation). The statute of limitation for each claim is shorter under Texas law than under New York law, and therefore, Texas law controls.[11]

---

**10.** Plaintiff argues that the claims arose in New York because that is where his "pocket book[ ]"—his Bear Stearns account from which he wire transferred the $650,000—is situated. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint ("Pl.Mem.") at 8. Plaintiff's argument has been rejected by this court in *Gordon & Co. v. Ross*, 63 F.Supp.2d 405, 408 (S.D.N.Y.1999), where Judge Miriam Goldman Cedarbaum stated: "In securities

fraud cases in which the plaintiff investor ordinarily has maintained an account at defendant brokerage and the loss is reflected in that account, courts have regularly held that the place of accrual for borrowing statute purposes is where the plaintiff resides."

**11.** Under New York law, a breach of fiduciary claim seeking only monetary relief is subject to a three-year statute of limitations. *See Bastys v. Rothschild*, 97 Civ. 5154, 2000 WL

The latest date on which plaintiff could claim that he discovered the facts underlying each of these claims is May 13, 1996, the date on which he filed the Texas Lawsuit. Plaintiff filed the instant complaint on July 20, 2000, more than four years after the statute of limitations commenced. Therefore, absent any tolling, plaintiff's claims are time-barred.

## 2. Tolling

 Plaintiff bears the burden of establishing that he is entitled to tolling. *See Overall*, 52 F.3d at 403. In borrowing a foreign statute of limitations, a court must also apply all extensions and tolls applicable in the foreign state. *See Gordon & Co.*, 63 F.Supp.2d at 409. Texas has a "wrong court" tolling statute, which tolls the statute of limitations during the period between the filing of a lawsuit in one court and the filing of that same action in a different court if: (1) the action was dismissed because of lack of jurisdiction in the initial court; and (2) the second action was commenced in a court of proper jurisdiction not later than the sixtieth day "after the date the dismissal or other disposition bec[ame] final."[12] Tex. Civ. Prac. & Rem.Code Ann. § 16.064(a) (Vernon 1986). This tolling provision is "remedial in its every essence [and] should therefore be given a liberal construction with a view of effectuating its manifest objective—relief from penalty of limitation bar to one who has mistakenly brought his action in the wrong court." *Griffen v. Big Spring Indep. Sch. Dist.*, 706 F.2d 645, 651 (5th

Cir.1983) (quotation marks and citation omitted). Indeed, the "statute may be stretched a little bit beyond its literal terms to effectuate its policies." *Id.*

Plaintiff first filed this action in Texas on May 13, 1996. That action was removed to federal court, where each of the current defendants was dismissed for lack of personal jurisdiction. As a result, plaintiff has met the first prong of section 16.064(a). The remaining question, then, is whether plaintiff filed this action within sixty days after the dismissal became "final"—a question which neither party addressed in their memoranda of law.

"[T]o borrow Mr. Justice Brandeis' famous phrase, 'final' ... is 'a word of many meanings,'" and it is defined differently in different contexts. *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir.1961) (citation omitted); *see also* Restatement (Second) of Judgments § 13 cmt. b (1982) ("The fact that a judgment is treated as final for purposes of res judicata does not necessarily mean that it is final for other purposes, for example, priority among lienors on property."). For example, a decision may be "final" in the context of issue preclusion even though it is not yet "final" for purposes of appeal under 28 U.S.C. § 1291. *See Lummus*, 297 F.2d at 89. Similarly, a judgment becomes "final" for purposes of habeas corpus relief under 28 U.S.C. § 2254 only after the petitioner's time for seeking certiorari expires. *See Valverde v. Stinson*, 224 F.3d 129, 132 (2d Cir.2000).

---

1810107, at *34 (S.D.N.Y. Nov.21, 2000). A fraud claim is subject to a six-year statute of limitations. *See* N.Y. C.P.L.R. § 213(8) (McKinney 1990). Similarly, plaintiff's negligent misrepresentation and civil conspiracy claims are subject to a six-year statute of limitations. *See Fromer v. Yogel*, 50 F.Supp.2d 227, 242 (S.D.N.Y.1999) (negligent misrepresentation); *Meridien Int'l Bank Ltd. v. Government of the Republic of Liberia*, 23

F.Supp.2d 439, 450 (S.D.N.Y.1998) (civil conspiracy).

**12.** This tolling statute is not applicable if a defendant can demonstrate that the plaintiff filed suit in the wrong court "with intentional disregard of proper jurisdiction." Tex. Civ. Prac. & Rem.Code Ann. § 16.064(b). Defendants here have made no such allegation.

Unfortunately, the Texas Court of Appeals has offered little guidance as to when a disposition becomes "final" for purposes of the "wrong court" tolling statute. *See Vale v. Ryan*, 809 S.W.2d 324, 327 n. 4 (Tex.1991) ("We do not address the question of when a disposition becomes final for purposes of section 16.064 where, for example, a district-court dismissal for lack of jurisdiction is later *affirmed* on appeal.") (emphasis in original). Nevertheless, if presented with the facts of this case, it is likely that the Texas Court of Appeals would hold that in order to effectuate the remedial purpose of the tolling provision, a dismissal becomes "final" only after all avenues for appellate review have expired.

In the Texas Lawsuit, the Fifth Circuit upheld the district court's dismissal of the current defendants on January 13, 2000, and issued its mandate on February 25, 2000. Plaintiff filed this suit on July 20, 2000, nearly five months later. However, after the instant motion to dismiss was fully briefed, the Texas lawsuit took a peculiar and remarkable turn. On December 1, 2000, the Fifth Circuit "recalled" the previously-issued mandate, "annulled" the January 13, 2000 opinion, and "reinstated" the appeals as against Rosenfeld and RBT. *See Lewis v. Fresne*, No. 99–20389, at ¶¶ 1, 2, 4 (5th Cir. Dec. 1, 2000). This action nullified both the January 13, 2000 opinion and the February 25, 2000 mandate. *See United States v. Jerry*, 487 F.2d 600, 607 (3rd Cir.1973) ("[W]hen a court vacates an order previously entered, the legal status

is the same as if the order never existed. The order having become a nullity, no rights, constitutional or otherwise, can be considered as accruing from it.") (citation omitted); *Wynne v. Rochelle*, 385 F.2d 789, 796 (5th Cir.1967) ("When an order is set aside as improvidently granted, the prior status of the case is restored and the situation is the same as though the order or judgment had never been entered."). Accordingly, there has been no "final" decision in the Texas Lawsuit and the sixty day clock has not been triggered.[13]

In order to achieve the remedial purpose behind section 16.064, plaintiff is entitled to the benefit of the "wrong court" toll even though a "final" decision in the Texas Lawsuit has not yet been entered. *See Winston v. American Med. Int'l, Inc.*, 930 S.W.2d 945, 954 (Tex.App.1996) (rejecting defendants' contention that filing of plaintiff's state suit two weeks before the federal court's dismissal became final bars tolling under section 16.064(a)). Accordingly, plaintiff's claims are not time-barred.

## B. Vicarious Liability

### 1. Defendants' Vicarious Liability Through Tower Hill

 The Individual Defendants contend that they cannot be held vicariously liable by virtue of their status as partners in Tower Hill for two reasons. *First*, citing N.Y. Gen. Oblig. Law § 15–107 (McKinney 1989),[14] defendants contend that plaintiff's claims against Tower Hill

---

**13.** Despite the fact that the Fifth Circuit reaffirmed the dismissals of Tannenhauser and Rosenblatt, *see Lewis v. Fresne*, No. 99–20389, at ¶ 3 (5th Cir. Dec. 1, 2000), that decision is not "final" until plaintiff's time for seeking further review expires. *See* 28 U.S.C. § 2101(c) (providing ninety days after entry of judgment to file petition for certiorari).

**14.** Section 15–107 provides, in relevant part:

A release of a partner from a partnership liability shall release his co-partners from the same liability to the creditor giving the release, but after a partnership has been dissolved, by consent or otherwise, any partner may make a separate composition or compromise with any partnership creditor, and such composition or compromise shall discharge from such liability the partner making it, and him only.

and against each of its partners were released when plaintiff released Fresne in the Texas Lawsuit.[15] *See* Def. Mem. 12–14. *Second*, defendants maintain that plaintiff cannot sue a partner on a partnership liability without either first suing the partnership or establishing that the partnership is unable to satisfy its alleged liability to plaintiff. *See* Def. Mem. at 14–15.

 Neither of defendants' arguments is persuasive. Fresne's Release explicitly excludes from its coverage "any non-settling defendants, which are not being released at all." The unambiguous language of the Release makes clear that the parties did not intend to release any claim against the other defendants in the Texas Lawsuit, including the defendants in this case. Moreover, defendants' reliance on section 15–107 of New York's General Obligations Law is misplaced. That section is limited to the contractual liabilities of a partnership. *See* N.Y. Gen. Oblig. Law § 15–107 ("A release of a partner from a partnership liability shall release his co-partners from the same liability to the *creditor* giving the release ....") (emphasis added). By contrast, a release provided to one of two or more persons liable in tort is governed by section 15–108 of New York's General Obligations Law, which provides that such a release does not discharge any of the other tortfeasors' liability "unless its terms expressly so provide." N.Y. Gen. Oblig. Law § 15–108(a) (McKinney 1989).[16] Here, plaintiff's claims arise in tort and the terms of the Release do not expressly discharge the Individual Defendants' liability.

Defendants' second argument also fails. Under New York law, general partners have joint and several liability for torts

---

15. The Release provides that plaintiff:

> fully and forever release and discharge Fresne ... (but specifically excluding any non-settling defendants, which are not being released at all) from and waive any and all claims ... which could have been alleged in the pleadings in the [Texas] Lawsuit and all claims which were or could have been asserted against Fresne arising out of, related to or in connection with any act, omission, misrepresentation, fact, event, occurrence or other subject matter which is or could have been alleged in the pleadings in the [Texas] Lawsuit ....

Fresne Release, Ex. 3 to 11/7/00 Declaration of Eric Rosenfeld in Support of Motion to Dismiss Amended Complaint, at ¶ 1.

The Release is properly considered part of the pleadings because plaintiff executed it and explicitly referred to it in the Amended Complaint. *See* Am. Compl. ¶ 7; *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (for purposes of a motion to dismiss, a complaint includes documents incorporated in it by reference, even if the documents are not attached as an exhibit, as well as documents that the plaintiff either possessed or knew about and upon which he relied in bringing suit).

16. New York law governs the substantive law of these claims because all parties have impliedly consented to its application by exclusively citing to New York law in their memorandum of law. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law.") (quotation marks and alterations omitted); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."). Furthermore, application of New York law as the substantive law does not conflict with the Court's earlier conclusion that, for purposes of the borrowing statute, the claims accrued in Texas. *See Stafford v. International Harvester Co.*, 668 F.2d 142, 150 n. 5 (2d Cir.1981) ("[A] cause of action may be considered as 'accruing,' for purposes of New York's borrowing statute, in a state different from the one whose substantive law would determine liability."); *Braune v. Abbott Labs.*, 895 F.Supp. 530, 564 (E.D.N.Y.1995) ("Different constructions of claims 'accrual' may apply within the choice-of-law context, for various purposes and issues, and within the 'borrowing' context.").

committed by the partnership, but only joint liability for the contractual obligations of the partnership. *See* N.Y. Partnership Law § 26(a) (McKinney 2001); *Baker v. Latham Sparrowbush Assoc.*, 808 F.Supp. 992, 1003 (S.D.N.Y.1992). "The result of [this] distinction is that while tort claims may be asserted against the individual partners in the first instance, contract claims must be asserted first against the partnership itself and not the individual partners, unless the partnership is insolvent or otherwise unable to pay its debts." *Ryan v. Brophy*, 755 F.Supp. 595, 598 (S.D.N.Y.1991). Because plaintiff asserts only tort claims against defendants for which each defendant is jointly and severally liable, plaintiff need not first sue Tower Hill or allege that it is insolvent prior to suing Tower Hill's general partners. *See Credit Lyonnais v. Getty Square Assoc.*, 876 F.Supp. 517, 522 (S.D.N.Y.1995). Accordingly, the Individual Defendants can be held vicariously liable by reason of their membership in Tower Hill.

### 2. Defendants' Vicarious Liability Through RBT

■ Defendants contend that Bernstein and Tannenhauser cannot be liable to plaintiff by reason of their membership in RBT because it was a registered limited liability partnership. *See* Def. Mem. at 11. Defendants correctly note that under New York law, partners of a limited liability partnership are not liable for the debts or liabilities, arising either in tort or contract, of the partnership solely by reason of their membership in that partnership.[17] *See* N.Y. Partnership Law § 26(b) (McKinney

2001). However, a partner may be liable for "any negligent or wrongful act or misconduct committed by [the partner] or by any person under his or her direct supervision and control while rendering professional services on behalf of" the limited liability partnership. N.Y. Partnership Law § 26(c).

RBT is a limited liability partnership. *See* Am. Compl. ¶ 5. Moreover, plaintiff has not alleged that any of the tortious acts were committed by Bernstein or Tannenhauser, or any individual under their control. Accordingly, Bernstein and Tannenhauser cannot be held vicariously liable by reason of their membership in RBT. However, because claims I and II assert that Rosenfeld's actions were taken on behalf of RBT and Tower Hill, Bernstein and Tannenhauser can be held vicariously liable for those claims by reason of their alleged membership in Tower Hill, a general partnership, irrespective of their membership in RBT.[18]

### B. Fraud

■ In an action to recover damages for fraud under New York law, the plaintiff must prove four elements: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury. *See AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 208 (2d Cir.2000) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

---

17. Indeed, plaintiff's memorandum of law does not reply to defendants' argument that Bernstein and Tannenhauser are not liable to plaintiff by reason of their membership in RBT.

18. The Amended Complaint is ambiguous with respect to claims III and IV, neither of which indicates whether Rosenfeld was acting on behalf of RBT or Tower Hill. Therefore, as currently plead, Bernstein and Tannenhauser cannot be held vicariously liable under claims III or IV.

Fraud actions are subject to the heightened pleading requirements of Rule 9(b):

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b).

■ Under Rule 9(b), a complaint alleging fraud must: " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). Rule 9(b) is intended "to provide a defendant with fair notice of plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Accordingly, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995).

With one exception,[19] the Amended Complaint pleads a fraud claim with sufficient particularity under Rule 9(b). The Amended Complaint provides ten examples of oral misrepresentations of material fact by Fresne and Rosenfeld. *See supra* Part II.B. Plaintiff has specified in sufficient detail the alleged fraudulent statements. Plaintiff has identified the speaker

of each misrepresentation, when each misrepresentation was made, and why each statement is fraudulent. While it is doubtful that each misrepresentation constitutes actionable fraud,[20] plaintiff has clearly provided sufficient examples of misrepresentations from which to infer fraudulent intent. Fresne and Rosenfeld, for example, allegedly informed plaintiff that Mad Martha's was the owner of the Nantucket Store, when, in fact, Mad Martha's did not own the lease to the store and was unable to secure that lease through litigation. Additionally, plaintiff was never informed that Young had commenced foreclosure proceedings. Nor was plaintiff informed of the commission Fresne, Rosenfeld, and RBT would receive upon consummation of Lewis' loan to Mad Martha's. Furthermore, plaintiff has alleged that Fresne and Rosenfeld made these statements and omissions knowing them to be false. *See* Am. Compl. ¶¶ 42, 44, 45.

Nevertheless, defendants contend that the ten examples of misrepresentations by Fresne and Rosenfeld do not constitute fraud. Primarily, defendants claim that most of the misrepresentations were not made by defendants—but rather, by Fresne. However, Fresne's misrepresentations are imputed to Rosenfeld because plaintiff alleges that Fresne was "parroting" Rosenfeld, and that Rosenfeld was telling Fresne what to say to plaintiff to induce him to invest in Mad Martha's. Am. Compl. ¶ 42. Moreover, any fraud claim that can be asserted against Rosenfeld can also be asserted against Bernstein and Tannenhauser because they are vicari-

---

**19.** Plaintiff alleges that Rosenfeld's June 20, 1995 letter and Farkas' June 14, 1995 letter contain misrepresentations of material fact. However, the Amended Complaint does not identify which of the statements in these letters are false or fraudulent.

**20.** For example, Fresne's statement that plaintiff's loan to Mad Martha's is a "no-brainer" may be nothing more than "the common puff of a salesman, not a material factual statement." *Bogart v. Shearson Lehman Bros.*, No. 91 Civ. 1036, 1995 WL 46399, at *2 (S.D.N.Y. Feb. 6, 1995) (quotation marks and citations omitted).

ously liable through their membership in Tower Hill. *See supra* Part III.B.1.

Defendants also contend that plaintiff has not adequately alleged justifiable reliance: "Because plaintiff made no effort to enforce his collateral, he cannot claim that he relied on any of the collateral, which he now attacks." Def. Mem. at 20. Defendants' argument misses the point. Plaintiff has adequately alleged that he justifiably relied on these misrepresentations and omissions in making the loan to Mad Martha's. *See* Am. Compl. ¶¶ 46, 52. This is not the time to evaluate that allegation. Accordingly, plaintiff has adequately alleged a claim of fraud and has satisfied the requirements of Rule 9(b).

## C. Civil Conspiracy

█ It is well settled under New York law that there is no substantive tort of conspiracy. *See Antonios A. Alevizopoulos and Assoc. v. Comcast Int'l Holdings, Inc.,* 100 F.Supp.2d 178, 187 (S.D.N.Y. 2000). Nevertheless, a plaintiff may plead the existence of a conspiracy in order to connect someone to an otherwise actionable tort committed by another and establish that those actions were part of a common scheme. *See Briarpatch Ltd., L.P. v. Pate,* 81 F.Supp.2d 509, 516 (S.D.N.Y. 2000). In order to state a claim for conspiracy plaintiff must allege an independent actionable tort and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) a party's intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *See Best Cellars Inc. v. Grape Finds at Dupont, Inc.,* 90 F.Supp.2d 431, 446 (S.D.N.Y.2000).

█ Here, plaintiff has adequately alleged the commission of at least one substantive tort—either common law fraud or breach of fiduciary duty. However, contrary to his assertion, plaintiff has not

alleged any facts which demonstrate that "all defendants, *including Bernstein and Tannenhauser* as well as Rosenfeld conspired together to tortiously divert plaintiff's money to themselves." Pl. Opp. at 17 (emphasis added). The Amended Complaint does not allege that Bernstein and Tannenhauser knew of Lewis' loan to Mad Martha's or the alleged misrepresentations on which Lewis relied. Indeed, the names "Bernstein" and "Tannenhauser" seldom appear in the Amended Complaint. Even drawing every inference in plaintiff's favor, I cannot find any allegation which implicates Bernstein or Tannenhauser in the alleged conspiracy between Rosenfeld, RBT and Fresne. Because the substantive torts are asserted against Rosenfeld and RBT, the conspiracy claim is duplicative of the breach of fiduciary duty and the common law fraud claims. Accordingly, claim III is dismissed. *See ESI, Inc. v. Coastal Power Production Co.,* 995 F.Supp. 419, 434 (S.D.N.Y.1998) (dismissing conspiracy claim that duplicated claim of breach of fiduciary duty); *Ferber v. Ehrlich,* No. 93 Civ. 818, 1994 WL 132168, at *9 (S.D.N.Y. Apr. 14, 1994) (holding that when "[n]o facts are alleged that distinguish the conspiracy to breach [defendant A's] fiduciary duty from the separate claim that [defendant A] breached his fiduciary duty to plaintiff ... [t]he conspiracy claim fails to state a claim upon which relief can be granted."); *Artco, Inc. v. Kidde, Inc.,* No. 88 Civ. 5734, 1989 WL 140284, at *7 (S.D.N.Y. Nov.15, 1989) (same).

## D. Negligent Misrepresentation

█ The Second Circuit has recently explained that under New York law, a negligent misrepresentation claim must satisfy the following elements:

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3)

the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000).

Defendants only contest plaintiff's ability to plead or prove the first element. Defendants maintain that "[a]s Mad Martha's attorneys, Rosenfeld and [RBT] cannot be said to have had or owed a fiduciary relationship, or a duty of care, to plaintiff." Def. Mem. at 23.

### 1. The Attorney Relationship

It is black letter law in New York that a party can assert a negligent misrepresentation claim against a professional only where there is either actual contractual privity or a relationship "so close as to approach that of privity." *Ultramares Corp. v. Touche*, 255 N.Y. 170, 182–83, 174 N.E. 441 (1931). Where actual contractual privity is lacking, New York courts apply three criteria for imposing liability on an attorney: (1) an awareness by the attorneys that the statement is to be used for a particular purpose; (2) plaintiff's reliance on the attorneys' statement; and (3) some conduct by the attorneys linking them to the relying party and evincing their understanding of that reliance. *See Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 384, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992). "These 'indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or bond'" with the attorney. *Parrott v. Coopers & Lybrand, L.L.P.*, 95 N.Y.2d 479, 484, 718 N.Y.S.2d 709, 741 N.E.2d 506 (2000) (quoting *Security Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 702–703, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992)).

Applying these criteria, courts have held that an attorney owes fiduciary duties to a party other than his client only under the rarest of circumstances. Indeed, such a holding is appropriate only when the attorney, at the client's request, issues an "opinion letter" which the attorney knew would be relied on by a third party. *See, e.g., Doehla v. Wathne Ltd.*, No. 98 Civ. 6087, 1999 WL 566311, at *19 (S.D.N.Y. Aug.3, 1999) (collecting cases); *Crossland Sav. FSB v. Rockwood Ins. Co.*, 700 F.Supp. 1274, 1282 (S.D.N.Y.1988). Standing alone, misrepresentations in contracts and other legal documents prepared by an attorney are not sufficient to create a fiduciary relationship with a third party. *See Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 97104, at *6 (S.D.N.Y Mar. 23, 1994) ("[T]o hold an attorney liable to third parties for the factual inaccuracies of every contract, or every legal document, he prepares would be to lurch towards the 'limitless liability' against which the New York Court of Appeals warned in *Prudential*."). Such a strict limitation stems from the concern for the sanctity of the attorney-client relationship—a concern which is not implicated in the context of attorneys' opinion letters:

> When a lawyer at the direction of her client prepares an opinion letter which is addressed to [a] third party or which expressly invites [a] third party's reliance she engages in a form of limited representation. Although the attorney is paid by and represents her client, in the opinion letter she expressly states (with her client's consent) that she is rendering a legal service to the third party....
>
> [W]here the opinion letter is addressed to the third party at the direction of the client, any resulting loss of confidentiality is as a result of the client's own decision and not that of the attorney.... As to zealous representation, the rendering of an opinion to a third

party at the client's direction for the advancement of the client's interests does not detract in any way from the attorney's loyalty to her client; she is serving her client's interest by rendering the opinion.... Finally, as to the ethical prohibition on the attorney's representation of an adverse party, that prohibition is not present where the client recognizes the potential conflict and nonetheless directs the attorney to furnish the opinion to the adverse party.

*Crossland Savings FSB,* 700 F.Supp. at 1282–83 (citations omitted).

■ Plaintiff has not alleged that Rosenfeld, or any member of RBT, provided an opinion letter. Indeed, plaintiff has not alleged that Rosenfeld or RBT gave him any advice, written or oral. Therefore, any fiduciary duties owed to plaintiff cannot arise out of the defendants' attorney-client relationship with Mad Martha's.

### 2. The Principal Relationship

■ Plaintiff contends, however, that his relationship with defendants fits within the ambit of the "special relationship" requirement because defendants were "principals of Mad Martha's (and not merely its attorneys), with an economic interest not only in Mad Martha's generally, but also in the particular proceeds of the loan they were soliciting." Pl. Opp. at 18.

"The existence of a fiduciary relationship does not turn on defendants' title." *Manela v. Garantia Banking Ltd.,* 5 F.Supp.2d 165, 180 (S.D.N.Y.1998). Moreover, the precise contours of what constitutes a "special relationship" are not easily demarcated and determining whether such a relationship exists must be made on a case-by-case basis. *See Dimon Inc. v. Folium, Inc.,* 48 F.Supp.2d 359, 373 (S.D.N.Y.1999) (quotation marks omitted). Nevertheless, it is well established that a simple commercial relationship, such as that between a buyer and seller, does not constitute a "special relationship" supporting a negligent misrepresentation claim. *See id.* However, such a commercial relationship may become a "special relationship" where "the parties ... enjoy a relationship of trust and reliance closer ... than that of the ordinary buyer and seller." *Polycast Tech. Corp. v. Uniroyal, Inc.,* No. 87 Civ. 3297, 1988 WL 96586, at *10 (S.D.N.Y. Aug.31, 1988) (quotation marks omitted). Indeed, on several occasions, this Court has refused to dismiss negligent misrepresentation claims where a plaintiff has alleged the existence of a special relationship between a buyer and seller in the context of a corporate acquisition involving lengthy negotiations. *See, e.g., Dimon,* 48 F.Supp.2d at 374; *Polycast Tech.,* 1988 WL 96586, at *12; *Delta Holdings, Inc. v. National Distillers & Chem. Corp.,* No. 85 Civ. 3439, 1988 WL 36330, at *9 (S.D.N.Y. Apr.11, 1988).

This transaction was more than a simple loan. Plaintiff was first contacted about investing in Mad Martha's in early 1995. At first, plaintiff was not interested in such an investment. *See* Am. Compl. ¶ 41. He only became interested upon further pressure from Lewis, who was "parroting" Rosenfeld. *See id.* ¶ 42. After considerable negotiations with Rosenfeld and Fresne over the next several months, plaintiff eventually agreed to invest in Mad Martha's. *See id.* ¶¶ 44–51. Plaintiff alleges that not only did defendants hold a stake in Mad Martha's which they never disclosed to Lewis, but they also had an undisclosed financial interest in the proceeds of his loan. It is because of these misrepresentations and omissions, among others, that plaintiff agreed to invest in Mad Martha's. *See id.* ¶ 52. For these reasons, and at this early stage of the litigation, I cannot rule out the possibility that the relationship among the parties was sufficient to impose a duty of care upon defendants. *See Gruber v. Victor,* No. 95 Civ. 2285, 1996 WL 492991, at *18

(S.D.N.Y. Aug.28, 1996) ("[C]ourts that have found, applying New York law, that no special relationship existed have typically done so, not at the pleading stage, but after trial, on the basis that plaintiffs have failed to carry their evidentiary burden.") (quotation marks omitted). Accordingly, defendants' motion to dismiss the negligent misrepresentation claim is denied.

## IV. CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Amended Complaint is granted in part and denied in part. A conference is scheduled for March 26, 2001 at 4:30 p.m.

SO ORDERED.