**In re RICKEL & ASSOCIATES, INC., Debtor.**

**Rickel & Associates, Inc., Robert Rickel, and Marvin Numeroff, Plaintiffs,**

v.

**Gregg Smith, Elliot Smith, and Wireless Acquisition Partners, LLC, Defendants.**

Bankruptcy No. 98 B 47203(SMB).
Adversary No. 01–2441.

United States Bankruptcy Court, S.D. New York.

Jan. 28, 2002.

Kelley, Drye & Warren LLP, James S. Carr, Mark Gregory, Mark R. Somerstein, Of Counsel, New York City, for Plaintiffs.

Olshan, Grundman, Frome, Rosenzweig & Wolosky LLP, Thomas J. Fleming, Andrew I. Silfen, Of Counsel, New York City, for Gregg Smith and Wireless Acquisition Partners, LLC.

Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Dale E. Barney, Of Counsel, New York City, Wechsler, Bursky & Cohen LLP, Robert M. Bursky, Of Counsel, New York City, Co–Counsel to Elliot J. Smith.

**MEMORANDUM DECISION DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

STUART M. BERNSTEIN, Chief Judge.

It is rare for a seller to claim that his buyer defrauded him into selling his own property at an unreasonably low price.

Yet this is such a case. The plaintiffs [1] charge, in the main, that the defendants, Gregg Smith ("Gregg"), his father Elliot J. Smith ("Elliot") and Wireless Acquisition Partners, LLC ("WAP"), defrauded the debtor and the Official Committee of Unsecured Creditors (the "Committee") into selling stock warrants owned by the debtor to WAP for much less than they were actually worth. The defendants have moved for summary judgment, or alternatively, to dismiss the Complaint. In addition, they have opposed the plaintiffs' related motion to vacate the order approving the sale of the warrants, making a summary judgment-type argument that the motion should be denied as a matter of law.

For the reasons that follow, the motions for summary judgment are denied, and the motions to dismiss are granted in part and denied in part. The plaintiffs' related motion to vacate the order approving the sale of the warrants raises the same factual issues as the main action, and the two will be tried together.

## BACKGROUND

### A. The Warrants

The debtor was a licensed broker-dealer engaged in providing, among other things, financial advisory, investment banking, and trading services. (Complaint ¶ 13.) In 1995, the debtor hired Elliot as President of its equities division, (*Id.* ¶ 18), and Gregg as an associate director (Gregg later became a managing director). (*Id.* ¶ 14.) Gregg was responsible for the debtor's investment banking activities. (*Id.* ¶ 15.)

In late 1995 or early 1996, Smartserv Online, Inc. ("SSOL") hired the debtor to serve as the managing underwriter for SSOL's initial public offering. (*Id.* ¶ 21.) As compensation for its underwriting services, the debtor received warrants to purchase SSOL common stock, dated March 21, 1996 (the "Underwriter's Warrant"). (*Id.* ¶ 24; Ex. A.) The Underwriter's Warrant granted two options to the debtor. First, the debtor could acquire 150,000 shares of SSOL common stock at an exercise price of $8.25 per share. Second, it could purchase additional SSOL warrants at $.165 per warrant, entitling it to purchase another 150,000 shares of SSOL common stock at an exercise price of $8.60 per share. (*Id.* ¶ 25.) In a separate transaction, the debtor also acquired 200,000 SSOL warrants, at various exercise prices (the "Consulting Warrants," which, together with Underwriter's Warrant, are referred to collectively as the "SSOL Warrants"). The Consulting Warrants compensated the debtor for consulting services performed for SSOL. (*Id.* ¶ 33.)

Of most significance to the present dispute, paragraph 7 of the Underwriter's Warrant contained anti-dilution provisions. (*Id.*, Ex. A, at 18–32.) Generally, SSOL triggered the antidilution provisions if it issued or sold shares of common stock or warrants for shares of common stock after the closing date of the Initial Public Offering below the then-existing price available to the holder of the Underwriter's Warrant. In that event, the option price decreased, and the number of shares available at the new option price increased.[2] Nearly 50 transactions occurred that triggered these anti-dilution protections. (*Id.*

---

1. The plaintiffs are the reorganized debtor, Rickel & Associates, Inc. and Robert Rickel and Marvin Numeroff, two subordinated creditors (the "Subordinated Creditor Plaintiffs").

2. The Consulting Warrants did not contain anti-dilution provisions.

¶ 28.) Both Gregg and Elliot were aware of the triggering events and tracked the adjustments precipitated by the anti-dilution provisions. (*Id.* ¶¶ 39, 40.)

## B. The Bankruptcy Proceedings

The debtor filed its chapter 11 petition on October 7, 1998. (*Id.* ¶ 12.) Gregg (who was no longer employed by the debtor) served as a member of the Committee. (*Id.* ¶ 17.) The Committee ultimately undertook the responsibility for liquidating the debtor's securities portfolio, (*id.* ¶ 34), and Gregg bore the primary responsibility for providing the Committee and its counsel with information concerning the debtor's rights under the SSOL Warrants. (*Id.* ¶ 35.)

Gregg, with Elliot's knowledge and support, intentionally and recklessly provided the Committee with false information, understating the number of SSOL Warrants and overstating the exercise price. (*Id.* ¶ 37.) Gregg and Elliot then jointly offered to buy the SSOL Warrants from the debtor, (*id.* ¶ 38), and Gregg undertook the primary role of negotiating the transaction with the Committee. (*Id.* ¶ 39.) Gregg kept Elliot advised of the negotiations, (*id.* ¶ 40), and Elliot knew that Gregg had intentionally or recklessly supplied false information to the Committee. (*Id.* ¶ 41.)

In a letter dated January 19, 2000, Gregg offered to purchase the SSOL Warrants (plus some other warrants owned by the debtor) for $175,000.00. (*Id.* ¶ 42.) The offer set forth the terms of the SSOL Warrants as reflected in the respective governing agreements, but did not refer to any adjustments resulting from the anti-dilution provisions. (*Id.* ¶ 43.) Two days later, Smith prepared and gave the Committee a chart (the "Unadjusted Chart") which listed the terms of the SSOL Warrants. (*Id.* ¶ 44.) The Unadjusted Chart included a disclaimer that the terms "were not adjusted for anti-dilution/splits." (*Id.*) In addition, the Unadjusted Chart did not account for the cashless conversion feature of the Consulting Warrants. (*Id.* ¶ 45.)

At about the same time, Gregg gave the Committee a revised chart (the "Adjusted Chart") depicting the terms of the SSOL Warrants. (*Id.* ¶ 46; *id.* Ex B.) The Adjusted Chart reflected the effect of an earlier reverse stock split which increased the exercise price and decreased the number of warrants. It did not, however, show the effects of any anti-dilution transactions. It also omitted the anti-dilution disclaimer found in the first chart even though Gregg and Elliot knew that the adjustments would show that the SSOL Warrants were "dramatically higher" than the Adjusted Chart depicted. (*Id.* ¶ 48.) Shortly thereafter, Gregg verified the adjusted terms, and confirmed for himself and Elliot that the Adjusted Chart materially misstated the value of the SSOL Warrants. (*Id.* ¶ 49.)

## C. The Sale to WAP

In late January 2000, the Committee conducted a telephonic auction of the debtor's warrants, and Gregg (acting for himself and Elliot) prevailed. (*Id.* ¶¶ 51–52.) Subsequent to the auction, Gregg and Elliot formed WAP, together with several other minority investors, to acquire the SSOL Warrants. (Complaint ¶ 53.) In late January or early February 2000, Gregg prepared computed-generated charts and spreadsheets for his and Elliot's use that reflected the adjustment for the anti-dilution provisions. They did not share their internal calculations with the debtor or the Committee. (*Id.* ¶ 55.)

WAP's counsel took the lead in preparing the asset purchase agreement for the warrant sale, and the motion to approve the transaction. The draft agreement attached a variation of the Adjusted Chart

(the "Motion Chart") that, like the Adjusted Chart, accounted for the reverse stock split but ignored the anti-dilution provisions. (*Id.* ¶¶ 56, 57.) Gregg, Elliot and WAP knew of or recklessly disregarded the inaccuracies, and intended the debtor and the Committee—who were not aware of the errors—to rely on the Motion Chart. (*Id.* ¶¶ 58.)

On March 21, 2000, one month after confirmation, the Court conducted an auction of the SSOL Warrants as well as the other warrants. Based on the Adjusted Chart and the Motion Chart, the debtors and the Committee believed that the SSOL Warrants were worth approximately $7 million, and accepted WAP's high bid of $3,525,000.00. (*Id.* ¶ 61.) At the time, the SSOL Warrants were actually worth well over $20 million; the defendants knew the actual value but the debtor and the Committee did not. (*Id.* ¶ 62.) The Court approved the sale to WAP pursuant to an order (the "Sale Order") issued that same day. The sale closed on April 3, 2000. (Complaint ¶ 63.)

After the sale, the above allegations came to the Court's attention. The Court appointed Edward S. Weisfelner, Esq., as Examiner, to investigate potential claims arising out of or related to the SSOL Warrant sale. (*Id.* ¶ 67.) The Examiner rendered a 66 page report (the "Report") on or about February 2, 2001. The Report identified a variety of claims against several persons. The Report is annexed to the Complaint as Exhibit D, and is incorporated in the Complaint "as if set forth at length." (Complaint ¶ 68.)

### D. This Adversary Proceeding

Armed with the Report, the plaintiffs commenced this adversary proceeding on or about February 26, 2001. The Complaint averred the following eight claims for relief[3]:

| Claim No. | Nature of Claim |
| --- | --- |
| 1 | The defendants committed securities fraud by misrepresenting the true value of the SSOL Warrants. |
| 2 | The defendants committed common law fraud by misrepresenting the true value of the SSOL Warrants. |
| 3 | The defendants were unjustly enriched. |
| 4 | The defendants should be compelled to turn over the SSOL Warrants or their proceeds. |
| 5 | The plaintiffs are entitled to a declaratory judgment that the defendants were not good faith purchasers for value with respect to the SSOL Warrants. |
| 6 | The Subordinated Creditor Plaintiffs charge that Gregg breached his fiduciary duty to the Committee and the creditors |
| 7 | Gregg negligently misrepresented the information regarding the true value of the SSOL Warrants |
| 8 | The claims asserted by Gregg and Elliot should be equitably subordinated. |

The defendants countered with motions for summary judgment, or alternatively, to dismiss the Complaint. The summary judgment motions rested on the premise that a contractual release discussed immediately below, barred all of the requested relief. In addition, the defendants contended that the Sale Order also barred any relief under principles of *res judicata.* Finally, they asserted that the Complaint failed to state claims for relief.

**3.** Unless otherwise noted, each claim is asserted by all plaintiffs against all defendants.

## DISCUSSION

### A. Summary Judgment Based On The Release

#### 1. Background

The release at issue concerned a settlement of an employment compensation dispute between Gregg, the debtor and the Committee. In early 1998, Gregg had commenced a pre-petition arbitration against the debtor, contending that the debtor owed him compensation; the debtor disputed the claim and asserted a counterclaim. After the bankruptcy was commenced, Gregg filed a priority and non-priority proof of claim (Claim No. 25) in the aggregate minimum amount of $585,527.00.

The parties subsequently executed a stipulation of settlement (the "Stipulation") that I "so ordered" on June 8, 2000, less than three months after the sale of the SSOL Warrants. The Stipulation, which granted Gregg an allowed Class 4 claim in the amount of $427,500.00, recited the following history and statement of purpose:

1. Gregg had filed claim (No. 25) in the minimum amount of $585,527, and intended to amend his claim to seek an additional $40,000 in commissions and $68,000 or more relating to his claim to receive Smartserv. Online warrants (the existing claim and the proposed amended claim were defined collectively as the "Gregg Smith Claim").

2. Gregg had commenced an arbitration pre-petition (the "Arbitration Claim").

3. The debtor disputed the Arbitration Claim, and filed its own counterclaim (the "Counterclaim") in the arbitration.

4. The parties desired to resolve "all issues and disputes with respect to the Gregg Smith Claim, the Arbitration and the Counterclaim, respectively, without the need for further litigation or cost to the respective parties. ..." [Emphasis added.]

Paragraph 4 of the Stipulation contained a broad general release by the debtor and the Committee:

All claims, interest and causes of action of any kind that has been heretofore or may be hereafter asserted and/or are owned, possessed or controlled by one or more of the Debtor, the Debtor's bankruptcy estate and/or the Committee against Smith ... are hereby waived, released and extinguished in their entirety and are deemed null and void and are of no further effect.

Finally, in paragraph 6, Gregg waived certain rights in disputed property:

Smith hereby relinquishes any right, title and interest in and to any claims, warrants, securities or assets of any kind that are in possession of the Debtor's estate or which constitute property of the Debtor's estate, ... other than: ... (ii) as Smith and/or any entity in which Smith owns an interest may acquire or has acquired by sale and/or assignment from the Debtor, its estate and/or the Committee pursuant to the Bankruptcy Court's Order Approving Sale of Debtor's Assets dated March 20, 2000....

Relying on the language in paragraphs 4 and 6, the defendants argue that the debtor and the Committee released any claims arising from the sale of the SSOL Warrants. The plaintiffs contend that the release did not reach the claims asserted in the adversary proceeding.[4]

---

4. Gregg also argues that the Stipulation cannot be vacated. (*See Memorandum of Law in Support of Defendant Gregg Smith's Motion for Summary Judgment or, Alternatively, to Dis-*

## 2. Standards Governing Motion

■ The interpretation of releases is governed by contract law. *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 514 (2d Cir.2001); *Albany Sav. Bank v. Halpin,* 117 F.3d 669, 672 (2d Cir.1997); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985). The primary objective is to give effect to the parties' intent as revealed in the language that they used. *Golden Pac. Bancorp v. FDIC,* 273 F.3d at 514; *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 148 (2d Cir.1993); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993). A court may grant summary judgment if the agreement is unambiguous and conveys a definite meaning, or the contract is ambiguous but there is no extrinsic evidence of the parties' intent. *Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co.,* 93 F.3d 1064, 1073 (2d Cir. 1996); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1094. Ambiguity is a question of law that the court must decide in light of the entire agreement. *Albany Sav. Bank v. Halpin,* 117 F.3d at 672; *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1094–95. An agreement is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology generally understood in the particular trade or business. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1095; *Brass v. American Film Tech., Inc.,* 987 F.2d at 149.

■ New York law frowns on agreements that exculpate a party from the consequences of his own wrongdoing.

*Golden Pac. Bancorp v. FDIC,* 273 F.3d at 515; *Gross v. Sweet,* 49 N.Y.2d 102, 424 N.Y.S.2d 365, 400 N.E.2d 306, 308 (1979). The language must reveal an "unmistakable intent of the parties" to release the alleged wrongdoer, *Golden Pac. Bancorp v. FDIC,* 273 F.3d at 515 (quoting *Gross v. Sweet,* 424 N.Y.S.2d 365, 400 N.E.2d at 309), and is subject to close judicial scrutiny. *Golden Pacific Bancorp v. FDIC,* 273 F.3d at 515; *Gross v. Sweet,* 424 N.Y.S.2d 365, 400 N.E.2d at 310; *Abramowitz v. New York Univ. Dental Ctr., College of Dentistry,* 110 A.D.2d 343, 494 N.Y.S.2d 721, 723 (N.Y.App.Div.1985).

■ Where a general release is given in a commercial dispute, and reflects the product of negotiation by parties represented by counsel, it is less likely that a court will find the broad language to be inadvertent or unintended. *See Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.,* 558 F.2d 1113, 1115 (2d Cir. 1977); *Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.),* 147 B.R. 855, 863 (Bankr.S.D.N.Y.1992); *Wells v. Shearson Lehman/Am. Express, Inc.,* 72 N.Y.2d 11, 530 N.Y.S.2d 517, 526 N.E.2d 8, 15–16 (1988). Nevertheless, a "release may not be read to cover matters which the parties did not desire or intend to dispose of." *Cahill v. Regan,* 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505, 510 (1959)(Fuld, J.); *accord Long Island Pipe Fabrication & Supply Corp. v. S & S Fire Suppression Sys., Inc.,* 226 A.D.2d 1136, 641 N.Y.S.2d 477, 478 (N.Y.App.Div.1996); *Enock v. National Westminster Bankcorp., Inc.,* 226 A.D.2d 235, 641 N.Y.S.2d 27, 28 (N.Y.App.Div.1996); *Lefrak SBN Assocs. v. Kennedy Galleries, Inc.,* 203 A.D.2d 256, 609 N.Y.S.2d 651, 652 (N.Y.App.Div.1994). Where the document

*miss,* dated May 11, 2001 (*"Gregg's Memorandum"*), at 16–18.) The plaintiffs, however,

are not attempting to vacate the Stipulation; they are contesting the scope of the release.

includes recitals or other language indicating an intention to settle a narrower dispute than the claims arguably encompassed in a general release, the scope of the release is ambiguous, parole evidence is admissible, and summary judgment is inappropriate. *Nichols v. United Exposition Serv. Co.,* 902 F.Supp. 32, 35 (S.D.N.Y.1995); *see Warden v. E.R. Squibb & Sons, Inc.,* 840 F.Supp. 203, 207 (E.D.N.Y.1993); *Perritano v. Town of Mamaroneck, et al.,* 126 A.D.2d 623, 511 N.Y.S.2d 60, 61 (N.Y.App.Div.1987).

### 3. The Ambiguity in the Release

■ While the release language contained in ¶ 4 of the Stipulation is quite broad, the terms of the Stipulation indicate an intention to settle a much narrower dispute. The title says that the parties were "[r]esolving claim no. 25 as filed by Gregg A. Smith." The historical description refers only to disputes arising in connection with Gregg's employment. Most important, the final "WHEREAS" clause, quoted above, states that the parties desired to settle all disputes relating to the Gregg Smith Claim, the Arbitration and the Counterclaim—not all of the disputes that might exist between them.

Furthermore, ¶ 6 of the Stipulation does not hint at an intention on the part of the debtor or the Committee to release anything. It contains a unilateral waiver by Gregg of certain claims involving the ownership of securities held in the name of the debtor. The waiver excepts the securities, including the SSOL Warrants, purchased at the bankruptcy court auction now under challenge. Paragraph 6 does not incorporate a corresponding waiver by the debtor of any of its rights against Gregg, and except for the release language discussed above, the Stipulation does not indicate

that the debtor intended to waive any rights.

Given the facial ambiguity, the Court may consider extrinsic evidence that is consistent with the express language of the agreement. *Golden Pac. Bancorp v. FDIC,* 273 F.3d at 517. The plaintiffs provided an affidavit of Kenneth Rickel,[5] the debtor's chairman and controlling shareholder. Based on his personal knowledge, (*see Rickel Affidavit* ¶ 1), Rickel stated that the release was given in connection with Gregg's employment claims, (*id.,* ¶ 6), was not intended as a global release, (*id.* ¶ 7), and Rickel did not even know about the SSOL Warrant sale dispute at the time that the debtor executed the Stipulation. (*Id.* ¶ 8.) Consequently, extrinsic evidence exists that supports the plaintiffs' argument that the parties did not intend to release Gregg (or anyone else) from the claims arising in connection with the sale.

Accordingly, summary judgment based on the release is not warranted. As a result, I need not consider Elliot's and WAP's argument that the release also exonerated them from liability in connection with the sale.

### B. Res Judicata

■ Next, the defendants argue that the Sale Order bars relief under the doctrine of *res judicata.* A bankruptcy court order approving a sale is a final order for *res judicata* purposes. *Gazes v. DelPrete (In re Clinton St. Food Corp.),* 254 B.R. 523, 530 (Bankr.S.D.N.Y.2000); *Balaber–Strauss v. Markowitz (In re Frankel),* 191 B.R. 564, 571 (Bankr. S.D.N.Y.1995). The court may nonetheless grant relief from a sale order under Fed.R.Civ.P. 60(b) (incorporated by Fed.

---

**5.** *See Affidavit of Kenneth Rickel in Opposition to Defendants' Motions for Summary Judgment* or *to Dismiss,* sworn to July 19, 2001 (*"Rickel Affidavit "*).

R. Bankr.P. 9024). The plaintiffs rely on Rule 60(b)(3) which authorizes relief from a final judgment for fraud, misrepresentation, or other misconduct of an adverse party.[6] To prevail, the movant must demonstrate by clear and convincing evidence that the opposing party engaged in a fraud or misrepresentation that prevented the movant from fully litigating the issue. *Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir.1989); *McFaul v. Loews Corp.*, No. 93 Civ. 2401(AGS), 1995 WL 699813 at *3 (S.D.N.Y. November 27, 1995).

The defendants assert that the plaintiffs' vacatur application faces four obstacles: (1) the plaintiffs cannot establish the elements for relief under Fed.R.Civ.P. 60(b)(3) because the Report establishes that the Debtor had actual and constructive knowledge of the alleged omissions in the Adjusted Chart and Motion Chart, (2) the plaintiffs cannot establish fraud because they could have discovered the existence of the anti-dilution rights simply by reading the Underwriter's Warrant, (3) the relief is barred by the Stipulation, discussed *supra*, and (4) the Court cannot "strip an order of the principles of *res judicata* or collateral estoppel—essentially rendering it an advisory opinion—while leaving the order in place." (*Objection of Wireless Acquisition Partners, G. Smith and E. Smith to Motion for Relief from Order Approving Sale of Assets*, dated May 11, 2001, at 2–3) ("*Defendants' Objection*"). In essence, the defendants argue that they are entitled to summary judgment denying the motion to vacate the Sale Order.

 The last two points deserve only brief comment. The Stipulation does not bar anything, at least as a matter of law. It is ambiguous, and its scope must be fleshed out at a trial. The final point concerns the preclusive effect of the Sale Order. The defendants argue, in substance, that the plaintiffs cannot avoid its preclusive effect unless the Court vacates it. (*Id.* at 17–20.) This is true, but the preclusive effect is not a defense to the vacatur motion. In other words, if the Sale Order is vacated, it loses its preclusive effect.

 The first two contentions, which are more substantial, are interrelated. They rest primarily on the argument that the plaintiffs cannot prove that they reasonably relied on anything that the defendants said or did. The defendants also contend that the plaintiffs cannot prove any of the other elements of their fraud claim. In support, they point to two sources of information: the Report and the Underwriter's Warrant.

The Report fails to show as a matter of law that the debtor had actual or constructive notice of the omissions in the Adjusted Chart and the Motion Chart. Initially, the evidence and findings in the Report are not binding. The Examiner conducted an investigation, but he was not charged—nor could he be—with the duty to "hear and determine" any claims in this case. The Report is hearsay, *United States v. Moore*,

---

**6.** Rule 60(b)(3) states:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:

\* \* \* \* \* \*

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party....

27 F.3d 969, 975 (4th Cir.1994), and does not permit denial of the motion to vacate as a matter of law without more. *Cf. Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45 n. 9 (2d Cir.1980)("A hearsay affidavit is a nullity on a motion for summary judgment").[7]

In any event, the Report indicates the possibility of fraud and the contested nature of the underlying facts. The Report confirms that the Adjusted Chart and the Motion Chart contained incorrect information regarding the number and strike price of the Underwriter's Warrant. At the outset, the holder had the right to purchase 150,000 shares of common stock (at $8.25 per warrant) and 150,000 warrants (to purchase an equal number of warrants for common stock) at $.165 per warrant. If the holder exercised the second warrant, he could then purchase an additional 150,000 shares of common stock at $8.60 per share. Collapsing the two steps, the holder could purchase the second set of 150,000 shares for $8.765 per share. As a result of the reverse 1:6 stock split, the aggregate number of available shares declined to 50,000, and the strike prices on the two sets increased sixfold, to $49.50 and $52.59,[8] respectively.

The Charts reflected the effect of the reverse stock split, but ignored the anti-dilution provisions, a material omission. As a result of the anti-dilution provisions, the holder had become entitled to purchase 90,000 shares at $13.50 per share and another 90,000 shares at $14.75. (*Report* 35.) On the day of the in-court auction, SSOL common stock closed at $130.50. (*Id.* at 36.) The difference on that day between the value of the Underwriter's Warrant shown in the Charts and its actual value was nearly $21 million.

The Report intimates that Gregg may have known the actual value of the SSOL Warrants prior to the auction but certainly before the closing. Tom Haller, SSOL's Chief Financial Officer, said he informed Gregg about the effect of the anti-dilution provisions in January or February 2000, something Gregg has denied. (*Id.* at 26.) In addition, WAP filed a Form 13D on March 31, 2000—ten days after the auction and three days *before* the closing—which referred to *prior* "informal discussions" with SSOL during which it provided the correct value information. (*Defendants' Joint Statement Pursuant to Rule 7056-1*, dated May 11, 2001, Ex. F, at 6.) Having made an inaccurate disclosure in the Charts, Gregg was duty-bound to supplement his disclosure with the correct information once he acquired it. *Brass v. American Film Tech., Inc.*, 987 F.2d at 150.

The Report does contain some evidence that Ken Rickel may have suspected that the Charts were inaccurate.[9] He did not trust Gregg, and tried to verify the accuracy of the Adjusted Chart with SSOL. However, his calls to Sebastian Cassetta, the chairman and Chief Executive Officer of SSOL, went unanswered. (*Report* 26.) Ken Rickel also asked Joe Fair, a minority equity holder of the debtor, to approach SSOL. (*Id.*) Fair contacted Tom Haller,

---

7. As discussed below, the statements in the Report are not admissions simply because the Report is attached to the Complaint and incorporated by reference.

8. The two Charts reflect a price of $51.77 for the second group. I cannot account for the difference between my calculation ($8.765 × 6=$52.59) and the one depicted in the

Charts, but the difference ($.82) is immaterial.

9. The Report indicates that counsel for the debtor and the Committee attempted to verify the information in the Charts, but does not intimate that they were able to obtain the information that Gregg had despite their efforts.

eventually received accurate value information, and passed it on to Ken Rickel a day or two before the auction. (*See id.* at 26, 34, 61.) According to the Report, Rickel thought Fair's information referred to additional SSOL warrants that were not being sold. (*Id.* at 34; *accord Rickel Affidavit* ¶ 41.)

In short, the Report does not mandate the conclusion that the plaintiffs cannot prove fraud. In fact, it confirms the inaccuracy of the Charts, and Gregg's knowledge of those inaccuracies although the point at which he acquired the correct information is disputed. It also indicates that counsel for the Committee and the debtor made some unsuccessful attempts to verify the Charts, and that Ken Rickel obtained relevant information which, he says he thought, referred to other SSOL warrants that were not then for sale.[10] Given these factual issues, a trial is necessary.

The defendants also insist the debtor and the Committee would have discovered the inaccuracies in the Charts if they had exercised due diligence by reading the Underwriter's Warrant. It is unclear whether the party moving under Rule 60(b)(3) must demonstrate due diligence. While Rule 60(b)(2) includes an express due diligence requirement, Rule 60(b)(3) does not. *Accord United States v. 710 Main Street,* 753 F.Supp. 121, 126 n. 5 (S.D.N.Y.1990); *Tas Int'l Travel Serv., Inc. v. Pan Am. World Airways, Inc.,* 96 F.R.D. 205, 207 (S.D.N.Y.1982)("due diligence standard applicable to motions under Fed.R.Civ.P. 60(b)(2) . . . is inapplicable to motions to vacate the judgment or for a new trial on

the basis of alleged perjurious testimony under Rule 60(b)(3)").

Nevertheless, due diligence is enmeshed with the element of justifiable or reasonable reliance:

> (if plaintiff) has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations. (Citations omitted).

*Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80–81 (2d Cir.1980)(quoting *Schumaker v. Mather,* 133 N.Y. 590, 30 N.E. 755, 757 (1892)); *accord Wynn v. AC Rochester General Motors Corp.,* 273 F.3d 153, 156 (2d Cir.2001); *Hyosung Am., Inc. v. Sumagh Textile Co. Ltd.,* 137 F.3d 75, 78 (2d Cir.1998); *see Country World, Inc. v. Imperial Frozen Foods Co.,* 186 A.D.2d 781, 589 N.Y.S.2d 81, 82 (App.Div.1992)(justifiable reliance can be defeated upon a showing of lack of due diligence).

The due diligence requirement is subject to two qualifications. First, the plaintiff is required to exercise due diligence if the misrepresentation does not relate to a matter peculiarly within the defendant's knowledge. *Mallis v. Bankers Trust Co.,* 615 F.2d at 80. On the other hand, if the matter is peculiarly within the defendant's knowledge, the plaintiff need not conduct an inquiry into the truth of the statement. *Id.* Second, in exercising due diligence, the plaintiff is only required to make a minimal investigation-enough to avoid a charge of recklessness—unless he has a hint of the falsity. *Banque Franco–Hellenique de Commerce Int'l et Mari-*

---

**10.** Ken Rickel was also a bidder. Given his interest in acquiring the SSOL Warrants (and possible motive for withholding the accurate number and strike price information from counsel for the debtor and the Committee),

the "adverse interest" rule may preclude the imputation of his knowledge to the debtor. *See Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828, 829–30 (1985).

*time, S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir.1997).

Aside from the information in the Report, which has already been discussed, the defendants contend that the debtor and the Committee could have learned of the existence of the anti-dilution provisions simply by reading the Underwriter's Warrant. They even submitted a reply declaration from one of their attorneys, Thomas J. Fleming, Esq., who pointed out that he was able to get a copy of the Underwriter's Warrant after less than thirty minutes searching on the Internet. (*Reply Declaration [of Thomas J. Fleming] in Further Support of Defendants' Motion for Summary Judgment or to Dismiss*, dated Aug. 17, 2001, at ¶ 2.)

The Underwriter's Warrant was attached to the Complaint, and the search was, therefore, unnecessary. More important, the argument misses the point. Knowing about the Underwriter's Warrant does not tell anything about its value. Instead, one would have to determine whether any triggering transactions occurred (the Complaint alleges 50), and then calculate the effect of each transaction under a complex formula in the Underwriter's Warrant. Mr. Fleming didn't do this. And although the defendants implied that the debtor or the Committee could have and should have, Gregg didn't do it either when he prepared the Charts.

Furthermore, the Complaint alleges that Gregg misrepresented the value of the SSOL Warrants, and the Form 13D attached to the Defendants' summary judgment papers implies that Gregg may have had the right value information even before the auction. Yet he failed to correct the misstatements in the Charts. Although, in hindsight, the debtor and the Committee might have discovered the value of the SSOL Warrants if they had pressed harder, "we are not disposed to be

severe on the victim of improper concealment or generous to its perpetrators." *Ross v. Kirschenbaum (In re Beck Indus., Inc.)*, 605 F.2d 624, 636 (2d Cir.1979)(Friendly, J.).

Accordingly, the existing record does not permit the conclusion that the debtor or the Committee could have determined the value of the Underwriter's Warrant through the exercise of due diligence, or that they cannot establish the other elements of their fraud claim under Fed. R.Civ.P. 60(b)(3) by clear and convincing evidence.

## C. Motion to Dismiss

Each of the Defendants also seeks to dismiss the Complaint under Fed.R.Civ.P. 12(b)(6), and where applicable, Rule 9(b). I must assume the truth of the factual allegations in the Complaint, *Harsco Corp. v. Segui*, 91 F.3d 337, 341 (2d Cir.1996), draw all reasonable inferences in the plaintiffs' favor, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). I may also consider the contents of any documents attached to the complaint or incorporated by reference, matters subject to judicial notice, and documents in the plaintiffs' possession or which they knew of or relied on in connection with the complaint. *Brass v. American Film Techs., Inc.*, 987 F.2d at 150; *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000).

### 1. First Claim–Securities Fraud

#### a. Claims against Gregg

##### i. Causation

Gregg moves to dismiss the first claim, based on violations of § 10(b) of the

Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 promulgated thereunder, because it fails to plead causation, reliance, or fraud with particularity. The securities fraud plaintiff must plead both transaction causation and loss causation. Transaction causation corresponds to reliance, *i.e.*, the plaintiff would not have entered into the transaction but for the fraud. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 96 (2d Cir.2001). Loss causation, on the other hand, "has been likened to the tort concept of proximate cause, meaning that in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d at 96; *accord Castellano v. Young & Rubicam, Inc.*, 257 F.3d at 186.

▉ The first claim satisfies both prongs of the causation requirement. The Complaint alleges that both the debtor and the Committee *relied* on the Motion Chart as an accurate expression of the value of the SSOL Warrants, (Complaint ¶¶ 59, 72), and the debtor believed, based on the Motion Chart, that the SSOL Warrants were worth approximately $7 million. (*Id.*, ¶ 61.) As a consequence, the debtor accepted WAP's $3,525,000.00 million bid, which it would not have done had it known the true value. (*Id.*, ¶¶ 61, 74.) In other words, the misrepresentation induced the debtor to accept an unreasonably low bid. Accordingly, the Complaint adequately pleads transaction and loss causation.

#### ii. Reasonable Reliance

▉ While the discussion of transaction causation establishes that the first claim alleges reliance, a fraud claim also requires that the reliance must be reasonable. *Brown v. E.F. Hutton Group, Inc., et al.*, 991 F.2d 1020, 1032 (2d Cir.1993). The defendant may defeat this element by showing that the plaintiff could have discovered the falsity of the alleged misstatement through the exercise of due diligence. *Royal Am. Managers Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir.1989).

According to Gregg, the allegations of reliance are inadequate as a matter of law in light of the contents of the Motion Chart, the Underwriter's Warrant and the Report. (*Gregg's Memorandum* 23–28.) He asserts that no rational seller would rely solely on the buyer for information (*i.e.*, the Motion Chart) regarding the value of the seller's own securities. (*Id.* at 25.) Gregg, however, does not cite any authority for his sweeping proposition, and I cannot conclude that the debtor's or the Committee's reliance on the Motion Chart was unreasonable as a matter of law. In addition, for the reasons discussed above, knowledge of the anti-dilution provisions would not inform the sellers that the Motion Chart misrepresented the value of the Underwriter's Warrant, or enable them to compute the value of the Underwriter's Warrant "with modest diligence, or even ordinary intelligence." (*Id.* at 27.) Again, Mr. Fleming apparently could not do it, and the delivery of the inaccurate Motion Chart implies that Gregg could not do it either.

This leaves the Report. The plaintiffs attached the Report to and incorporated it into the Complaint, and both sides cited the Examiner's "findings" in support or in opposition to dismissal. Under Fed. R.Civ.P. 10(c) (incorporated by Fed. R. Bankr.P. 7010), a document attached to a pleading becomes part of the pleading. Nevertheless, the Rule does not mean that the plaintiff adopts as true every statement in the exhibit. Instead,

[a]n appended document will be read to evidence what it incontestably shows once one assumes that it is what the complaint says it is (or, in the absence of a descriptive allegation, that it is what it appears to be).

*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir.1995).

The Complaint alleged that the Court appointed an Examiner, he issued his final report on February 2, 2001, and his final report is attached to and incorporated in the Complaint as if set forth in full. (Complaint ¶¶ 67–68.) This forecloses the plaintiffs from arguing that the Examiner did not render a report, that the attachment is not the report he rendered, or that he reached conclusions that contradict the conclusions the Report says he reached. *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d at 675. On the other hand, the plaintiffs did not automatically adopt every statement in the Report did not as true simply by attaching it to their Complaint.

In any event, and again for many of the reasons discussed above, the Report does not incontestably show that Ken Rickel knew the value of the Underwriter's Warrant prior to the auction, or that the debtor's and Committee's professionals did not rely on the Charts. (*See Gregg's Memorandum* 28.) Joe Fair told Ken Rickel that the number of warrants exceeded what the Motion Chart showed, but Ken

Rickel believed that this meant that the debtor owned more SSOL warrants than it was selling to WAP. (*Report* 34.) In addition, the professionals were not able to confirm the number and strike price of the Underwriter's Warrant, despite their efforts, and this may simply indicate that the information was not as easily obtainable as Gregg now suggests. Finally, the Examiner concluded that securities fraud claims exist against Gregg, notwithstanding his findings. (*Id.* at 50.) In short, the Report does not establish the absence of reasonable reliance as a matter of law.

### iii. Failure to Plead with Particularity

 Next, Gregg argues that the first claim fails to plead fraud with particularity, as required by Section 21D of the 1934 Act[11] and Fed.R.Civ.P. 9(b), made applicable by Fed. R. Bankr.P. 7009. To satisfy these requirements, the securities fraud plaintiff must specify the statements that he contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995). In addition, the complaint must allege facts giving rise to a strong inference of *scienter—viz.*, intent to defraud. *See* 15

---

11. The relevant provisions of Section 21D, codified in 15 U.S.C. § 78u–4(b), state:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

.In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

U.S.C. § 78u 4(b)(2); *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000).

The plaintiff may satisfy this requirement by (1) alleging facts showing the defendant's motive and opportunity to commit fraud, or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001); *Acito v. IMCERA Group, Inc.,* 47 F.3d at 52; *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994). Allegations of motive must show that the defendant hoped to realize personal, concrete benefits from the fraud, as opposed to the general benefits that inure to all corporate executives. *Kalnit v. Eichler,* 264 F.3d at 139. "Opportunity" is shown by "means and likely prospect of achieving concrete benefits by the means alleged." *BRS Assocs., L.P. v. Dansker,* 246 B.R. 755, 768 (S.D.N.Y.2000)(quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d at 1129).

The Complaint adequately pleads motive. Gregg knew the SSOL Warrants were worth more than he told the Committee and the debtor. He initially negotiated to buy them for himself and his father. WAP ultimately made the purchase, paying $3,525,000.00 for $20 million worth of SSOL Warrants, but Gregg owned a substantial percentage of WAP. Thus, he stood to gain a significant personal benefit from the sale.

In addition, the Complaint adequately pleads opportunity. As a member of the Committee, Gregg was aware of the debtor's and the Committee's desire to sell the securities, and became a prime mover. He provided inaccurate information regarding their value, and then made an extremely low offer. After he won the telephonic auction, WAP drafted the sale agreement, prepared the application to the Court, out-bid Ken Rickel at the auction and consummated the deal.

The Complaint also adequately pleads conscious misbehavior or recklessness because it links "the misleading statement with facts that give rise to an inference that the speaker had a basis for knowing it was false." *BRS Assocs., L.P. v. Dansker,* 246 B.R. at 769. By late January or February 2000, Gregg knew the true value of the SSOL Warrants. (Complaint ¶¶ 49, 55.) By then, he had prepared charts and spreadsheets reflecting the adjustments required by the anti-dilution provisions. (*Id.,* ¶ 55.) Thereafter, he produced the Motion Chart, which did not reflect the increased value triggered by the anti-dilution provisions. (*See id.* ¶¶ 56, 57.)

Accordingly, the first claim for relief states a legally sufficient securities fraud claim under § 10(b) of the Securities Exchange Act and Rule 10b-5, to the extent that it is alleged on behalf of the debtor against Gregg. However, it fails to state a claim for relief on behalf of the Subordinated Creditor Plaintiffs against Gregg because they were not sellers of the SSOL Warrants. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). As a result, the Subordinated Creditor Plaintiffs' securities fraud claims must be dismissed.

**b. Claims Against Elliot**

In addition to the deficiencies noted by Gregg (and previously rejected), Elliot argues that the first claim fails to state a claim for primary liability against him. In *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that liability under § 10(b) of the 1934 Act and Rule 10b-5 applies only to those who engage in the manipulative or deceptive practice and not to those who aid and abet the violation.

*Id.* at 177, 114 S.Ct. 1439. Secondary actors may nonetheless be subject to primary liability provided that all of the requirements for primary liability are met. *Wright v. Ernst & Young, LLP,* 152 F.3d 169, 174 (2d Cir.1998). While the actor does not have to communicate the false statement directly to the victim, the misrepresentation must be attributed to the actor at the time of the dissemination. *Id.* at 175.

■ Elliot insists that the Complaint fails to allege that he made a misrepresentation, and hence, he cannot be held liable for securities fraud. He is half right, and therefore wrong. The Complaint attributes all of the misstatements to Gregg, and only knowledge and support to Elliot. According to the Complaint, Gregg intentionally or recklessly provided false information to the Committee regarding the value of the SSOL Warrants with Elliot's "knowledge and support." (Complaint ¶ 37.) Gregg alone prepared the Unadjusted Chart, (*id.* ¶ 44), the Adjusted Chart, (*id.* ¶ 46), and the Motion Chart. (*Id.* ¶ 56.) Elliot simply knew that the Adjusted Chart and the Motion Chart contained inaccuracies and intended that the debtor and the Committee would rely on the inaccurate information. (*Id.* ¶¶ 47, 58; see ¶ 41.)

The Complaint also alleges, however, that Gregg was acting for Elliot as well as for himself. Gregg and Elliot "jointly offered to purchase the SSOL Warrants from the Debtor," (*id.* ¶ 38), Gregg undertook the primary negotiating role with the Committee regarding the purchase by Gregg and Elliot, (*id.* ¶ 39), Gregg informed Elliot of the negotiations regarding the purchase by Gregg and Elliot, (*id.* ¶ 40), and Gregg and Elliot became the controlling members of WAP, owning, collectively, 80% of its equity. (*Id.* ¶ 11.)

These averments sufficiently allege that Gregg acted as Elliot's agent in connection with the negotiations with the Committee during which Gregg prepared and provided the false information.[12] In *Suez Equity Investors,* the Second Circuit held that *Central Bank* did not eliminate the primary liability of the principal based on the fraudulent activities of its agent. 250 F.3d at 101; *accord Vento & Co. of New York, LLC v. Metromedia Fiber Network, Inc.,* No. 97 Civ. 7751(JGK), 1999 WL 147732, at *12 (S.D.N.Y. Mar.18, 1999).[13] According-

---

12. The Complaint also indicates that Gregg and Elliot may have been engaged in a joint venture to purchase the SSOL Warrants. A joint venture is a " 'special combination of two or more persons where in some specific venture a profit is jointly sought.' " *See Gramercy Equities Corp. v. Dumont,* 72 N.Y.2d 560, 534 N.Y.S.2d 908, 531 N.E.2d 629, 632 (N.Y.1988)(quoting *Forman v. Lumm,* 214 A.D. 579, 212 N.Y.S. 487, 490 (N.Y.App.Div. 1925)); *accord Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.,* 116 F.R.D. 477, 480 (S.D.N.Y.1987). Each co-venturer is both the principal and the agent of every other co-venturer. *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 366 (2d Cir.1986).

13. Prior to *Suez Equity Investors, L.P.,* the courts in this district had split on whether *Central Bank* preserved primary liability based on principles on agency. *See Vento &*

*Co. of New York,* 1999 WL 147732, at *12 (collecting cases). The view supporting primary liability based on principles of agency made two points, one specific to corporations and one more general. Corporations can only act through agents, and without vicarious liability, a corporation could never be liable as a primary violator. *Id.; see Suez Equity Investors, L.P.,* 250 F.3d at 101. In addition, a dishonest principal could insulate himself by hiring an honest, unwitting agent to disseminate the false information. Without vicarious liability, the principal would escape primary liability as a mere aider and abettor, and the agent would avoid liability because he lacked *scienter. See In re ICN/Viratek Sec. Litig.,* No. 87 Civ. 4296, 1996 WL 164732, at *6 (S.D.N.Y. Apr.9, 1996); *accord Vento & Co. of New York,* 1999 WL 147732, at *12.

ly, Elliot's motion to dismiss the first claim is denied as to the debtor, but is granted as to the Subordinated Creditor Plaintiffs for the same reason that Gregg's motion was granted.

### c. Claims Against WAP

██ The foregoing discussion also addresses the bulk of WAP's initial basis for opposing the first claim.[14] Citing several pre *Suez Equity Investors* cases decided in this district, WAP argued that *Central Bank* eliminated primary liability based on agency. In light of *Suez Equity Investors* (which was decided within a few days of WAP's moving memorandum), WAP now contends that WAP was formed after the preparation and dissemination of the Unadjusted Chart and the Adjusted Chart. Gregg could not be an agent for a non-existent principal, and hence, WAP cannot be liable based on Gregg's alleged fraud.

There are several responses. WAP concedes that the Motion Chart was disseminated after WAP was formed; in fact, WAP attached it to the draft contract that its lawyer prepared. (*See Reply Memorandum of Defendants Gregg A. Smith's and [WAP's] Motion for Summary Judgment or Alternatively to Dismiss,* dated Aug. 24, 2001 ("*Gregg/WAP Reply* "), at 23.) Since, the Motion Chart provides a basis to sue Gregg for securities fraud, it also provides a basis to sue Gregg's corporate principal, WAP.

The alleged pre-incorporation fraud by Gregg raises a more subtle issue that the parties have not addressed. The Complaint charges that Gregg, acting for himself and Elliot, made a deal with the debtor, and thereafter, Gregg and Elliot, along with others, formed WAP to consummate the deal, which WAP did. The debtor now argues that the transaction was induced by fraud and seeks to attribute Gregg's pre-incorporation fraud to WAP.

██ ██ The unauthorized fraudulent acts of an agent will be imputed to the principal if the principal ratifies the fraud by accepting the benefit of those acts. *Zanoni v. 855 Holding Co.,* 96 A.D.2d 860, 465 N.Y.S.2d 763, 764 (N.Y.App.Div.1983), *aff'd,* 62 N.Y.2d 963, 479 N.Y.S.2d 341, 468 N.E.2d 296 (1984); 2A N.Y. JUR. 2D, *Agency & Independent Contractors* § 194 (1998). The same rule applies where the agent commits the fraud prior to the time that the principal comes into legal existence. *In McDermott v. Harrison,* 9 N.Y.S. 184 (N.Y.Sup.Gen.Term 1890), a party entered into a stock subscription agreement with a corporation, based upon the fraudulent statements made by the promoters before the corporation had been created. The court concluded that the shareholder was nevertheless entitled to rescind the subscription agreement. The corporation became liable by adopting and ratifying the fraudulent acts; it could not retain the benefits of the subscription agreement but repudiate its liability for the fraud committed by those who procured it. *Id.* at 186. Further, once the tortfeasors became officers of the corporation, their knowledge of the fraud was imputed to the corporation. *Id.* at 187.

In the same vein, WAP cannot accept the benefits of the SSOL Warrants sale, and at the same time, avoid liability created by the alleged misrepresentations that induced it. Accordingly, WAP's motion to dismiss the first claim, like the motions made by its co-defendants, is denied as to the claims asserted by the debtors but

---

**14.** I need not discuss the common grounds raised by WAP and Gregg for dismissing the first claim. As with Elliot, they are rejected for the same reason that they were rejected in connection with Gregg's motion.

granted as to the claims raised by the Subordinated Creditor Plaintiffs.

## 2. Second Claim—Common Law Fraud

The defendants have moved to dismiss the plaintiffs' second claim which is based on common law fraud, contending that the Complaint does not allege reasonable reliance. In addition, Elliot maintains that the Complaint fails to allege that he made a misstatement, the same deficiency he attributed to the first claim. WAP contends, as it did in seeking the dismissal of the first claim, that the Complaint does not allege that it committed any wrongdoing.

The elements of common law fraud—material misrepresentation, intent to deceive, reasonable reliance, proximate cause and damage, *May Dept. Stores Co. v. International Leasing Corp.*, 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987)—are essentially the same as the elements of a claim under § 10(b) of the 1934 Act and Rule 10b–5. *Scone Inv., L.P. v. American Third Market Corp.*, No. 97 Civ. 3802(SAS), 1998 WL 205338, at *10 (S.D.N.Y. Apr.28, 1998). The motion to dismiss the second claim is, therefore, denied for the same reason that I refused to dismiss the first claim, at least with regard to the debtor.

The Subordinated Creditor Plaintiffs' common law fraud claims must, however, be dismissed. They have failed to plead that the defendants made any representations to them, that they relied on any representations or that they suffered any direct damages. At most, they allege a derivative claim which belongs to the debtor and has been asserted by the debtor.

## 3. Third Claim—Unjust Enrichment

■ The third claim alleges that the defendants have been unjustly enriched.

The elements of an unjust enrichment claim under New York are (1) a benefit to the defendant (2) at the plaintiff's expense which (3) in "equity and good conscience" should be restored. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.2000) (applying New York law). Gregg maintains that the remedy is barred by the written sale agreement. In addition, given the defects in the debtor's fraud claim, "equity and good conscience" do not require the restoration of any benefits. WAP has adopted Gregg's argument, and Elliot has filed his own brief asserting the same arguments against the debtor as well as the individual plaintiffs.

■ Under New York law, quasi-contractual claims such as unjust enrichment are barred if a written contract between the parties governs the subject matter of their dispute. *Briggs v. Goodyear Tire & Rubber Co.*, 79 F.Supp.2d 228, 236 (W.D.N.Y.1999); *Gidatex S.r.L. v. Campaniello Imports, Ltd.*, 49 F.Supp.2d 298, 301 n. 4 (S.D.N.Y.1999); *Nelson v. Stanley Blacker, Inc.*, 713 F.Supp. 107, 111 (S.D.N.Y.1989); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (1987). If the plaintiff invalidates the contract, however, he may then recover in quasi-contract based on unjust enrichment. *Bazzano v. L'Oreal, S.A.*, No. 93 Civ. 7121, 1996 WL 254873, at *3 (S.D.N.Y. May 14, 1996); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1272 (S.D.N.Y.1991); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 521 N.Y.S.2d 653, 516 N.E.2d at 193; *see* JOHN D. CALAMARI & JOSEPH M. PERILLO, LAW OF CONTRACTS § 1–12, at 20 (3rd ed.1987).

Here, the debtor and WAP entered into an asset purchase agreement following the auction to cover the purchase of the warrants, the subject matter of the dispute. The agreement was approved by the Sale

Order, as it had to be since it involved a transaction outside of the ordinary course of business. *See* 11 U.S.C. § 363(b)(1). If the Sale Order is vacated, the parties' agreement will no longer be authorized, and the common law bar to recovery will be removed.

■■■ In more straightforward terms, the debtor's claim essentially turns on proving that it was fraudulently induced to enter into the sale agreement. *See Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1272 (S.D.N.Y.1991)(if the agreement was induced by fraud, recovery under a theory of unjust enrichment may be proper)(applying New York law). As noted, the plaintiffs contend that they were defrauded into selling to the defendants securities worth nearly $21 million for less than $4 million. This suffices to allege a claim for unjust enrichment.

The defendants' reliance on *Mina Inv. Holdings Ltd. v. Lefkowitz,* 51 F.Supp.2d 486 (S.D.N.Y.1999) is misplaced. There, the debtor's first lender charged that the second lender had been unjustly enriched by making a loan, obtaining warrants from the borrower, and thereby diluting the first lender's equity in the borrower. The second transaction was an arms-length deal, and there was no allegation of fraud. The Court dismissed the unjust enrichment claim, noting that the amended complaint failed to allege how the second lender was unjustly enriched by the dilution of the first lender's interest. *Id.* at 490. This case is much simpler. The plaintiffs allege that the defendants, through fraud, induced them to sell the SSOL Warrants for less than 20% of their actual value.

Accordingly, the motion to dismiss the debtor's unjust enrichment claim is denied.[15] Once again, however, the Subordinated Creditor Plaintiffs' claims are derivative of the debtor's claim and must be dismissed. The third claim alleges that the defendants were unjustly enriched at the debtor's expense because WAP bought the SSOL Warrants. The Subordinated Creditor Plaintiffs suffered only indirectly as a result of the debtor's direct injury.

### 4. Fourth Claim—Turnover

■■■ The fourth claim demands a turnover of the SSOL Warrants. Section 542(a) of the Bankruptcy Code requires, with certain non-germane exceptions, that

an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, *shall deliver to the trustee,* and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate. [Emphasis added.]

The defendants have moved to dismiss this claim on the ground that they no longer have possession of the SSOL Warrants (they were sold), and the plaintiffs have responded with various arguments that attempt to parse the words of § 542(a) and quibble with the defendants over the meaning of "possession."

■■■ The turnover claim is legally insufficient for a more basic reason. Confirmation vests the property of the estate in the debtor, unless the plan or confirmation order provide otherwise. 11 U.S.C. § 1141(b).[16] As a consequence, the bank-

---

**15.** Unlike the fraud claims, no defendant has argued or implied that he is entitled to a dismissal even if the unjust enrichment claim against another defendant survives.

**16.** Section 1141(b) states:

Except as otherwise provided in the plan or the order confirming the plan, the confirma-

ruptcy estate ceases to exist, and the debtor in possession disappears. *In re Jamesway Corp.*, 202 B.R. 697, 701 (Bankr. S.D.N.Y.1996). Under § 542, the sole recipient of the turnover is the trustee, the representative of the estate. *See* 11 U.S.C. § 323(a). Since there is no estate and no trustee after confirmation, there can be no turnover. *See, e.g., Poplar Run Five Ltd. Partnership v. Virginia Elec. & Power Co. (In re Poplar Run Five Ltd. Partnership)*, 192 B.R. 848, 856 (Bankr.E.D.Va.1995)(after confirmation, the estate ceased to exist, and there was no estate to receive "estate property" pursuant to §§ 542 and 543); *Venn v. Kinjite Motors, Inc. (In re WMR Enters., Inc.)*, 163 B.R. 887, 889 (Bankr.N.D.Fla.1994)(turnover under § 542 is not available following confirmation because there is no longer an estate).

Here, all of the property of the estate, including the SSOL Warrants vested in the debtor upon confirmation. The Confirmation Order, dated March 7, 2000, states that all of the property of the estate vests in the debtor unless the Confirmation Order or the Plan provided otherwise. (Confirmation Order ¶ 3.) The Confirmation Order does not contain any other reference to vesting, and the Plan does not refer to vesting at all.[17] Accordingly, the estate and the debtor in possession, its representative, ceased to exist upon confirmation,[18] and the plaintiffs cannot maintain the turnover action. The fourth claim is, therefore, dismissed.

### 5. Fifth Claim—Declaratory Relief

The plaintiffs, in the fifth claim, seek declaratory relief against all of the defendants. They allege that each defendant knew or should have known that the debtor and the Committee relied on materially inaccurate information regarding the value of the SSOL Warrants, (Complaint ¶ 91), that the SSOL Warrants were worth substantially more than the amount WAP paid, (*id.* ¶ 92), and that the debtor and the Committee were relying on the defendants to provide accurate valuation information. (*Id.* ¶ 93.) As a result, a real and justiciable controversy exists concerning whether the defendants exercised good faith in connection with the sale of the SSOL Warrants, and whether they were *bona fide* purchasers for value. (*Id.* ¶ 94.) In their dismissal motion, the defendants argue that the claim serves no purpose, and will embroil the parties in additional litigation.

Declaratory relief is proper, "only (i) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (ii) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings." *Maryland Casualty Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir.1971). A court has broad discretion to decide whether to render a declara-

---

tion of a plan vests all of the property of the estate in the debtor.

**17.** I can take judicial notice of the contents of the Confirmation Order and the Plan, and therefore, consider them on the defendants' motion to dismiss.

**18.** The confirmation documents include isolated references that imply the continuing existence of some sort of estate. For example, the Plan says that the Committee will continue post-confirmation, and may retain profes-

sionals who will be paid by the "estate." (Plan at 29.) This appears to be inartful drafting, equating the "debtor" and its "estate." The provisions regarding the fate of unclaimed dividends reflect the drafter's unintentional merging of two legal entities. The Plan says that unclaimed dividends "revert back to ownership of the Debtor." (*Id.* at 26.) The Confirmation Order, however, states that unclaimed dividends "shall be deemed property of the Debtor's estate." (Confirmation Order ¶ 16.)

tory judgment. *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1100 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994). Where the Court has a declaratory judgment action and a direct action involving the same issues, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint. *Id.; see* 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2759, at 550–51 (1998).

I decline to entertain the plaintiffs' request for declaratory relief. First, it raises the same issues as the direct claims. In essence, the fifth claim alleges that the defendants knew or should have known that the debtor and the Committee relied on the valuation information that the defendants provided, and that the information understated the value of the SSOL Warrants. These allegations track the reliance and *scienter* averments in the fraud and negligent misrepresentation claims. The fifth claim and the direct claims involve the same issues and evidence, and would be tried and decided at the same time. Further, the decision on the direct claims would render the request for declaratory judgment moot.

Second, the plaintiffs have not explained why the defendants' status as good faith purchasers for value is material. In other words, the plaintiffs have not shown that the determination will serve a useful purpose or resolve any uncertainty. Accordingly, the fifth claim for relief is dismissed.

### 6. Sixth Claim—Breach of Fiduciary Duty

 In the sixth claim for relief, the Subordinated Creditor Plaintiffs contend that Gregg breached his fiduciary duty to the Committee and to the other creditors. After the commencement of the case, the United States Trustee appointed a committee to represent the unsecured creditors, *see* 11 U.S.C. § 1102(a), and Gregg became a member. The Committee and its members owed a fiduciary duty to the class they represented, but not to the individual creditors within the class or to the estate. *ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners L.P.)*, 210 B.R. 508, 516 (Bankr.S.D.N.Y. 1997); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y.), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992). As fiduciaries, they were required to be honest, loyal, trustworthy and without conflicts of interest. *In re Johns–Manville Corp.*, 26 B.R. 919, 925 (Bankr. S.D.N.Y.1983).

Initially Gregg makes two threshold objections—the Subordinated Creditor Plaintiffs did not belong to the class that the Committee represented, but even if they did, neither the Committee nor Gregg owed any duty to the Subordinated Creditor Plaintiffs. The first point is clearly without merit. The Subordinated Creditor Plaintiffs were unsecured creditors, although subordinated. They had the same interests as the non-subordinated unsecured creditors, and were represented by the Committee throughout the case.

 Further, although the Committee and Gregg did not owe a duty to the individual Subordinated Creditor Plaintiffs, the latter appear to be the only creditors, other than Gregg and Elliot, left in the case. In essence, their claim is being asserted on behalf of the remaining "innocent" creditors, and if they are not permitted to do so, no one else will.[19] It would

---

19. This fact distinguishes the present situation

from *In re Granite Partners, L.P.*, 210 B.R. at

exalt form over substance to prohibit their prosecution of the claim, and let a possible wrongdoer escape in the process.

▪ The more difficult issue is whether the Subordinated Creditor Plaintiffs have adequately pleaded their claim. Calling a man a fiduciary only begins the analysis, and does not answer how he failed to discharge his duties. *SEC v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *In re Russo*, 762 F.2d 239, 242 (2d Cir.1985); *In re Beck Indus., Inc.*, 605 F.2d at 634. As a rule, the fiduciary who transacts business with his beneficiary must turn square corners.[20] He is obligated "to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know." RESTATEMENT (SECOND) OF TRUSTS § 170(2) (1959); *accord Wendt v. Fischer*, 243 N.Y. 439, 154 N.E. 303, 304 (1926)(Cardozo, J.)("If dual interests are to be served [by a fiduciary], the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance."). Further, the beneficiary's consent to the transaction will be vitiated by the fiduciary's improper conduct or the failure to make full disclosure unless the fiduciary knew or had reason to know that the beneficiary was aware of the material facts or did not care. RESTATEMENT OF RESTITUTION § 191(2) (1937). Consequently, sales to insiders of the debtor are subject to heightened scrutiny. *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr.S.D.N.Y. 1988).

▪ Although Committee members owe fiduciary duties, they are hybrids who serve more than one master. Every member of the Committee is, by definition, a creditor. Thus, he is competition with every other creditor for a piece of a shrinking pie. He may assert his rights as a creditor to the detriment of the creditor body as a whole without running afoul of his fiduciary obligations. *See Krafsur v. UOP (In re El Paso Refinery, L.P.)*, 196 B.R. 58, 74 (Bankr.W.D.Tex.1996).

▪ Nor does Committee membership necessarily disqualify the member from bidding for estate assets since one goal of bankruptcy is to maximize the bidding. *See In re Russo*, 762 F.2d at 242; *In re Beck, Indus., Inc.*, 605 F.2d at 637. Experience shows that creditors are often the only ones interested in buying the estate's property, and imposing an automatic disqualification on Committee members may chill the desire to serve on the Committee in the first place. *See In re El Paso Refinery, L.P.*, 196 B.R. at 74. To insure the integrity of the sale and satisfy itself that the Committee member has not breached his fiduciary duty, the Court must be persuaded that the Committee member did not use his position to advance his personal interest at the expense of the creditor class. *In re Haskell–Dawes, Inc.*, 188 B.R. 515, 522 (Bankr.E.D.Pa.1995); *In re Map Int'l, Inc.*, 105 B.R. 5, 6 (Bankr. E.D.Pa.1989); *In re Enduro Stainless, Inc.*, 59 B.R. 603, 605 (Bankr.N.D.Ohio 1986); *cf. In re Russo*, 762 F.2d at 243 (reversing order disqualifying buyer at bankruptcy sale and remanding to bankruptcy court to determine whether mean-

516–17 where the Court implied that individual creditors could not sue the members of the unsecured creditors committee for breach of fiduciary duty. There, the plaintiffs comprised only a small part of a much larger creditor body.

20. Since the Committee member owes no duty to the estate, it would seem that he could transact business with the estate and not violate his duty. The debtor's managers, however, manage the estate as trustees for the creditors. Hence, the unsecured creditors, the Committee member's *cestui que trust*, are the ultimate beneficiaries of the transaction.

ingful opportunity existed for buyer to take unfair advantage of confidential information acquired in his earlier role as trustee).

█ There is no question that the debtor, the Committee and the Court knew that Gregg was pursuing his personal interests when he bid for the SSOL Warrants, and eventually consummated the sale through WAP. Nevertheless, the Complaint implies and the record discloses that Gregg used his position as a Committee member to open the door to negotiations to buy the SSOL Warrants. The Committee was responsible for liquidating the debtor's portfolio, (Complaint ¶ 34), and Gregg had the primary responsibility for providing the Committee with information regarding the debtor's rights. (*Id.* ¶ 35.) According to a document that the defendants attached to their Rule 7056–1 statement, Committee counsel initiated contact with Gregg, in his capacity as Committee member, to determine the value of the debtor's warrants. (*Defendants' Joint Statement Pursuant to Local Rule 7056–1*, Ex. C.) Gregg responded with the initial value information, mentioned the reverse stock split and the anti-dilution provisions, and asked counsel to contact him before making any sales. (*Id.*) [21]

This apparently gave Gregg a leg up on any potential buyer. Armed with knowl-edge of the Committee's intention, and asking counsel to keep him informed, Gregg began negotiations and ultimately offered to buy the SSOL Warrants owned by the debtor. (*See Complaint* ¶¶ 39–42.) Furthermore, the Complaint suggests that prior to the offer, and possibly prior to any negotiations or expression of interest in buying the SSOL Warrants, Gregg misrepresented their value to the Committee. (*See* Complaint ¶¶ 37–38.)

In short, the Complaint alleges that Gregg used his position as a member of the Committee to misrepresent the value of the SSOL Warrants to the Committee, and initially monopolize the negotiations for their purchase. Although it soon became apparent that Gregg was acting for his own benefit as well as Elliot's (at least according to the Complaint), the Complaint adequately alleges that Gregg used his position and information obtained while a member of the Committee to advance his personal interest to the detriment of the other creditors. The question is a factual one, and accordingly, the motion to dismiss the sixth claim is denied.[22]

### 7. Seventh Claim—Negligent Misrepresentation

█ The seventh claim charges that Gregg negligently misrepresented the val-

---

**21.** Although not part of the Complaint, I have considered the contents of Exhibit C in connection with the motion to dismiss as an admission by the defendants.

**22.** In his reply brief, Gregg argued for the first time that New York's Martin Act bars the breach of fiduciary duty claim, citing *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir.2001). (*See Gregg/WAP Reply* 35–36.) I decline to consider this contention first raised in the reply brief, (*see Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 496 (S.D.N.Y. 2001)) (declining to consider contention first raised in the reply brief that the Martin Act precluded claims for negligence and gross negligence), although I am not ruling on the effect of the failure to raise it until then. First, the argument was mentioned in the last brief filed by the parties in connection with the motion to dismiss. Second, the reply brief also cited pre-*Castellano* cases, and could have been asserted earlier. Third, at least one district court, while recognizing the precedential effect of *Castellano,* has observed that New York case law does not support the preemption argument, and has suggested that the Second Circuit might reach a different conclusion the next time. *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2498, 2001 WL 1112548, at *3–4 & n. 6 (S.D.N.Y. Sept.19, 2001).

ue of the SSOL Warrants. Under New York law, the elements of a negligent misrepresentation claim are (1) a special relationship imposing a duty to impart correct information, (2) a false representation, (3) *scienter*, (4) reasonable reliance, (5) proximate cause and (6) damages. The *scienter* requirement demands proof that the defendant knew the plaintiff wanted the information for a serious purpose, and should have known that the information supplied was false or inaccurate. *See Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir.2000); *Lewis v. Rosenfeld*, 138 F.Supp.2d 466, 479–80 (S.D.N.Y.2001). Gregg's dismissal motion cites two shortcomings: the failure to plead a special relationship and the failure to plead reasonable reliance. The latter argument has already been addressed and rejected in connection with the fraud claims, leaving only the former to decide.

■■■ The law imposes a duty to speak with care "when 'the relationship ... [is] such that in morals and good conscience the one has the right to rely upon the other for information.'" *Kimmell v. Schaefer*, 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450, 454 (1996)(quoting *International Prods. Co. v. Erie R.R. Co.*, 244 N.Y. 331, 338, 155 N.E. 662 (1927)). Under certain circumstances, a special relationship may be found in an arms-length commercial transaction. In *Kimmell*, a commercial case, the New York Court of Appeals explained that the existence of a special relationship, an issue intertwined with the justification for the plaintiff's reliance, is a factual question governed by the weighing three factors:

In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

*Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d at 103 (quoting *Kimmell v. Schaefer*, 652 N.Y.S.2d 715, 675 N.E.2d at 454).

■■■ In the present case, the Complaint alleges that Gregg held, or appeared to hold, special expertise regarding the value of the SSOL Warrants. He was in charge of the debtor's investment banking activities. (Complaint ¶ 15.) One of his duties involved the preparation of "regular periodic spreadsheets detailing the terms—including the amount and exercise price—of all warrants that the Debtor received for its services." (*Id.* ¶ 20.) The debtor acted as the managing underwriter for SSOL's initial public offering, and Gregg oversaw drafting SEC Form SB–2 and conducting due diligence. (*Id.* ¶¶ 22–23.) The debtor received the Underwriter's Warrant as compensation, (*id.* ¶ 24), and Gregg subsequently tracked the adjustments triggered by the anti-dilution provisions. (*Id.* ¶ 29.) After Gregg became a member of the Committee, he had the primary responsibility for providing its counsel with information regarding the debtor's rights relating to the SSOL Warrants. (*Id.* ¶ 35.) [23]

---

**23.** In fact, in early January, 2000, Jonathan Pasternak, Esq., the Committee's lawyer, asked Gregg how many warrants the debtor had to sell. Gregg provided the information, and concluded "please consult me before making any other security sales b/c i know what is happening at these companies—they were my clients." (*Defendants' Joint Statement Pursuant to Local Rule 7056–1*, Ex. C.) Thus, the Committee looked to Gregg, and Gregg boasted about his special knowledge.

In addition, the Complaint alleges facts indicating that Gregg was "aware of the use to which the information would be put and supplied it for that purpose." *See Kimmell v. Schaefer*, 652 N.Y.S.2d 715, 675 N.E.2d at 454. Gregg knew that the debtor or the Committee, or both, would rely on the accuracy of the Adjusted Chart and the Motion Chart to value the SSOL Warrants. (*See id.* ¶¶ 47, 71, 93.) Further, he provided the inaccurate information intending that they rely on it. (*Id.* ¶¶ 47, 58.)

Finally, the Complaint alleges a special relationship of trust. Gregg was a member of the Committee, (*id.* ¶ 17), and owed a fiduciary duty to the unsecured creditors. The Committee undertook the responsibility to liquidate the debtor's securities portfolio, (*id.* ¶ 34), and Gregg was primarily responsible for providing the Committee and its counsel with information regarding the debtor's rights under the SSOL Warrants. (*Id.* ¶ 35.) Gregg argues that Ken Rickel did not trust him and in any event, there was no basis to view the relationship as "special" once he became a prospective purchaser of the debtor's asset, but the existence of a special relationship is a factual question. At this stage, I cannot rule out the possibility that the debtor will be able to prove a special relationship, or more generally, negligent misrepresentation.[24]

The Subordinated Creditor Plaintiffs' claims, however, are deficient for the same reasons that their fraud claims fell short. Gregg did not make any representation to them, they did not rely on any representation, and they were not damaged directly. There damage was indirect by virtue of the damage suffered by the estate. Ac-

cordingly, their negligent misrepresentation claims are dismissed.

### 8. Eighth Claim—Equitable Subordination

 The eighth and final claim alleges that Gregg's and Elliot's claims should be equitably subordinated "to Allowed Interests of Equity Interest Holders (as defined in the Plan)." (Complaint ¶ 110.) Section 510(c) permits the court to subordinate a claim to a claim or an interest to an interest under principles of equitable subordination. A claim under Section 510(c) requires the plaintiff to demonstrate that (1) the creditor engaged in inequitable conduct, (2) the conduct caused injury to the creditors or gave the claimant an unfair advantage, and (3) equitable subordination is consistent with the Bankruptcy Code. *ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514 (Bankr.S.D.N.Y.1997); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr.S.D.N.Y.1994). To state a claim of inequitable conduct, the complaint must allege conduct that fits within one of three paradigms: (1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, or (3) control or use of the debtor as an alter ego for the benefit of the claimant. *In re Granite Partners, L.P.*, 210 B.R. at 514; *In re 80 Nassau Assocs.*, 169 B.R. at 838. Gregg and Elliot maintain that the Complaint fails to plead inequitable conduct. However, the allegations of fraud are sufficient to satisfy this requirement.

 The eighth claim is nevertheless legally insufficient. It seeks to subor-

---

**24.** In his reply brief, Gregg asserted, for the first time, that the negligent misrepresentation claim is pre-empted by New York's Martin Act. (*Gregg/WAP Reply* 31–32.) I decline to consider this argument for the same reasons discussed in connection with the breach of fiduciary duty claim.

dinate Gregg's and Elliot's claims to the "Allowed Interests of the Equity Interest Holders." The Complaint states that the phrase is defined in the Plan, but it is not. Giving the phrase its apparent meaning, I assume the plaintiffs are attempting to subordinate Gregg's and Elliot's claims to the equity interests which, curiously, were to be canceled under the Plan. *See In re Rickel & Assocs., Inc.,* 260 B.R. 673, 675 (Bankr.S.D.N.Y.2001). In any event, the express language of § 510(c) prohibits the subordination of a claim to an interest, and the eighth claim is, therefore, dismissed.

## CONCLUSION

The motions for summary judgment are denied. The motions to dismiss the Complaint are granted to the extent of dismissing the fourth, fifth and eighth claims in their entirety, and dismissing the first, second, third and seventh claims to the extent they seek relief on behalf of Subordinated Creditor Plaintiffs. The motions to dismiss are otherwise denied. Finally, in light of the above, the plaintiffs companion motion to vacate the Sale Order on the ground of fraud raises factual issues and will be tried together with the issues raised in the Complaint. The parties are directed to contact my Chambers to schedule a pre-trial conference. Settle order on notice.